[18 NE3d 701, 994 NYS2d 1]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NEIL
GILLOTTI, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GEORGE
F. FAZIO, Appellant.

Argued April 30, 2014; decided June 10, 2014

## POINTS OF COUNSEL

*David J. Farrugia, Public Defender*, Lockport (*Joseph G. Frazier* of counsel), for appellant in the first above-entitled action.

The Sex Offender Registration Act court failed to apply the proper legal standard, the level three designation is an unjust, unintended and anomalous result under the Sex Offender Registration Act and the Risk Assessment Guidelines, and the court's denial of a downward departure was error. (*People v Mingo*, 12 NY3d 563; *People v Pettigrew*, 14 NY3d 406; *People v Whyte*, 89 AD3d 1407; *People v Inskeep*, 91 AD3d 1335; *People v McCollum*, 41 AD3d 1187; *People v Carswell*, 8 AD3d 1073, 3 NY3d 607; *People v Wyatt*, 89 AD3d 112; *People v Johnson*, 11 NY3d 416; *People v Poole*, 90 AD3d 1550; *People v Blackman*, 78 AD3d 803.)

*Michael J. Violante, District Attorney*, Lockport (*Laura T. Bittner* and *Thomas H. Brandt* of counsel), for respondent in the first above-entitled action. County Court's designation of defendant as a level three sex offender was supported by clear and convincing evidence; the court did not abuse its discretion when it denied defendant's request for a downward departure. (*People v Johnson*, 11 NY3d 416; *People v Palmer*, 20 NY3d 373; *People v Pettigrew*, 14 NY3d 406; *People v Hawkins*, 11 NY3d 484; *People v Ascher*, 106 AD3d 448; *People v Marrero*, 37 Misc 3d 429; *People v Labarbera*, 41 Misc 3d 321; *People v Wyatt*, 89 AD3d 112, 18 NY3d 803; *People v Carter,* 106 AD3d 1202; *People v Young*, 108 AD3d 1232.)

*James P. Milstein, Public Defender*, Albany (*Christopher J. Ritchey* of counsel), for appellant in the second above-entitled action. The court erred during the appellant's Sex Offender Registration Act hearing when it scored the appellant points for a stranger relationship to his victims and multiple victims. (*People v Johnson*, 11 NY3d 416; *People v Jusino*, 11 Misc 3d 470; *People v Arotin*, 19 AD3d 845; *People v Marrero*, 37 Misc 3d 429; *People v Alemany*, 13 NY3d 424; *People v McFarland*, 29 Misc 3d 1206[A], 2010 NY Slip Op 51705[U], 88 AD3d 547.)

*P. David Soares, District Attorney*, Albany (*Steven M. Sharp* of counsel), for respondent in the second above-entitled action. Defendant's designation as a risk level two sex offender was proper. (*People v Alemany*, 13 NY3d 424; *People v Johnson*, 11 NY3d 416; *People v Poole*, 90 AD3d 1550.)

### OPINION OF THE COURT

ABDUS-SALAAM, J.

In *People v Johnson* (11 NY3d 416 [2008]), we recognized that children depicted in child pornography are "victims" of sex of-

fenses within the meaning of the Sex Offender Registration Act (Correction Law art 6-C [SORA]), and we held that where an offender is a stranger to such victims prior to his or her commission of a child pornography offense, the SORA Risk Assessment Guidelines and Commentary promulgated by the Board of Examiners of Sex Offenders (the Board) authorize the assessment of points under guidelines factor 7, which accounts for the increased risk of sexual recidivism posed by an offender whose crime is directed at a stranger (*see Johnson*, 11 NY3d at 418-420). Noting that the assignment of points to a child pornography offender under factor 7 may sometimes result in an excessive risk calculation in a manner not contemplated by the guidelines or the statute, we further determined that a court at a SORA hearing should account for that anomaly in a particular case by ordering a discretionary downward departure to a lower risk level classification (*see id.* at 420-421).

In these appeals, we are called upon to answer three questions arising in the wake of *Johnson*. First, may a SORA court assess points against a child pornography offender under the plain language of guidelines factor 3, which is based on the number of victims involved in the offender's crime? Second, does a recent document issued by the Board, which describes the document as a position statement on the evaluation of child pornography cases under SORA, prohibit a SORA court from assigning points to an offender under factors 3 and 7? Third, where an offender requests a downward departure in a child pornography case, or any other SORA case, must the offender prove the facts supporting a departure by clear and convincing evidence or only by a preponderance of the evidence? We hold that factor 3 permits the scoring of points based on the number of different children depicted in the child pornography files possessed by an offender, that the Board's position statement does not bar the assignment of points under factors 3 and 7 in child pornography cases, and that an offender must prove the facts supporting a downward departure by a preponderance of the evidence.

I

*People v Gillotti*

In 2008, defendant Neil Gillotti, who was 19 years old at the time, was serving in the United States Air Force at a military base in England. Other military personnel discovered about 40 pornographic videos and numerous pornographic images featur-

ing children between the ages of 5 and 14 on defendant's laptop and desktop computers. When confronted about the pornographic files, defendant admitted that he possessed them, and he claimed that he had originally downloaded them when he was a teenager and that he had viewed over 1,000 child pornography files during his teenage years. After military charges were brought against defendant, he pleaded guilty to sexual exploitation of a child in violation of the United States Uniform Code of Military Justice article 134 (10 USC § 934) and 18 USC article 110. Defendant served his sentence in military custody, received a bad conduct discharge, was removed from service and returned to the United States.

Upon his return to the United States, defendant moved into his mother's house in Middleport, New York. Because defendant was required to register as a sex offender in New York pursuant to SORA, the Board prepared a risk assessment instrument (RAI) and case summary to assess defendant's risk of reoffending and his dangerousness to the community under the guidelines. The Board assigned points to defendant under a variety of guidelines factors, resulting in a total score of 55 and a presumptive risk level one classification.[1] As most pertinent for purposes of appeal, the Board did not assess points against defendant under factors 3 and 7. However, the Board recommended an upward departure to a risk level two classification.

Prior to a scheduled SORA hearing, the People requested that the court adjudicate defendant a risk level three sex offender by assigning him additional points pursuant to factors that did not form the basis of the Board's recommendation. In particular, the People asserted that defendant should be assigned additional points under the following guidelines factors: factor 3, number of victims (30 points for three or more victims); factor 7, relationship with victim (20 points for victims who were strangers to defendant); and factor 15, living/employment situation (10 points for defendant's employment situation being inappropriate). The People contended that, because numerous children were depicted in the pornographic images and were exploited for the viewing pleasure of defendant and other consumers of

---

1. Under the guidelines, a score of 70 points or less results in a presumptive risk level one classification. A score of more than 70 points and less than 110 points results in a presumptive risk level two classification. A score of 110 points or more results in a presumptive risk level three classification (see Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 3 [2006] [hereinafter Guidelines]).

child pornography, defendant should be assessed points for having victimized multiple children. Furthermore, in the People's view, defendant had an inappropriate employment situation, as he was working at a local amusement park where he was frequently exposed to children. Thus, the People argued, defendant should be assessed 115 points, rendering him a risk level three sex offender. At a SORA hearing, defendant generally opposed the People's request to order a risk level classification greater than the one recommended by the Board, specifically challenged any assessment of points under factor 3 and sought a downward departure; he did not, however, oppose scoring pursuant to factor 7.

At the hearing, the People submitted to the court the Board's RAI, the case summary, and the Air Force Office of Special Investigations case file. As noted, those materials revealed that defendant had possessed numerous violent and meticulously catalogued pornographic images and videos of children. As far as the People's documentary evidence revealed, defendant did not know any of the children featured in those computer files.

According to the military records, defendant claimed that he had downloaded the pornographic files when he was approximately 14 or 15 years old, that he had long since ceased viewing the files and that he had simply failed to delete them when he brought his computers with him to the Air Force. However, the military investigation revealed that when defendant was about 17½ years old, he had entered an Internet chat room and attempted to send someone a file entitled "13-year-old virgins forced into sex after school." After his guilty plea, defendant wrote a letter of apology to one of the individuals depicted in his files, who had been located by the National Center for Missing and Exploited Children. In the letter, defendant expressed regret over viewing the images of this individual based on his own experience with sexual abuse, explaining that his mother had told him that he had been sexually abused by a family member in an incident that he could not recall.

As a counterpoint to the People's evidence at the hearing, defendant presented the testimony of certain friends and relatives. Defendant also submitted to the court several letters and a certificate of completion from an anger management program, all of which had been provided to the military tribunal in support of a clemency request, and defendant provided the court with newspaper and journal articles describing the ease and

frequency with which young people sometimes inadvertently accessed child pornography on the Internet. Defendant further presented the report of Dr. David Heffler, who had examined defendant in order to evaluate his likelihood of reoffending.

The defense witnesses testified about defendant's good character prior to his joining the military, describing his extensive volunteer work, community involvement, role model status, good reputation among friends and family, and computer skills. According to the witnesses, defendant lived with his mother, was almost never left alone in the house and did not engage in any inappropriate behavior. Defendant also had a steady six-month-old relationship with his girlfriend. Upon a friend's recommendation, defendant got a job at Darien Lake Amusement Park, where he was regularly in the presence of the children who visited the park.

Dr. Heffler reported that one of his associates had conducted a polygraph test of defendant. The polygraph results indicated that defendant had falsely told the examiner that he had not viewed child pornography since the age of 16, that he had not saved the pornographic files on his laptop after their discovery, that he had not known that he had transferred those files from an older computer to his laptop, and that he was no longer attracted to images of children.

The report also described Dr. Heffler's interview with defendant. In the interview, defendant explained that he had not participated in sex offender treatment after his release from military detention. Defendant had received counseling and antidepressant medication during the pendency of the legal proceedings in this case, and he had stopped watching child pornography, though he continued to view adult pornography.

According to Dr. Heffler's report, defendant was not cognitively impaired, presented in a polite and socially acceptable manner, had no history of mental illness, and did not show any interest in certain fetishes and violent sexual conduct. On the other hand, the testing and the interview suggested to Dr. Heffler that defendant may have continued to view child pornography beyond his teenage years, which reflected his unhealthy sexual interest in children. Dr. Heffler stated that defendant essentially put on a pleasant front, had difficulty managing negative emotions, internalized anger, exhibited emotions that were incongruent with a given situation, lacked empathy, and was at risk of engaging in gratifying behaviors to mask negative emo-

tions. Defendant's emotional control problem was "a trait associated with sexual offense." Dr. Heffler also explained that defendant's behavior followed a familiar paradigm for child pornography offenders, stating:

> "This Classical Conditioning paradigm occurs as a result of repetitive pornography use, eventually leading to diminished interest and arousal. When this occurs the user loses interest in usual images and begins searching for images that will produce the desired level of arousal. As in [defendant's] case they will begin searching legal but more taboo images, such as fetish or 'barely legal' teen sites. As the arousal to these images gradually decreases (habituation), the search begins for more arousing material."

Further discussing his findings, Dr. Heffler noted that a recent study had indicated that child pornography users who do not commit "hands-on" offenses have only a 4% rate of committing such hands-on offenses in the future, which was "considerably lower" than the rate for other types of offenders. Regarding defendant specifically, however, Dr. Heffler identified a number of risk factors for recidivism, including defendant's various emotional and psychosexual problems and his "[p]ast volunteer work with children which may have served to sate his unhealthy interest in children." Dr. Heffler recommended diagnoses of "Hebephilia: Non-Exclusive Type" and "Pedophilia: Non-Exclusive Type." Dr. Heffler opined, "Based on the above assessment findings, it is my professional opinion, with a reasonable degree of clinical certainty that, in spite of the relative lower rate of sexual recidivism for child pornography offenders, [defendant] continues to present a risk of sexual recidivism." Dr. Heffler also recommended various treatment program conditions for defendant, including refraining from use of pornography, from online computer use unrelated to his employment and from "employment or volunteer work that permits access to children under the age of 18."

After the SORA hearing, in a written decision and order, the court adjudicated defendant a risk level three sex offender. The court accepted the People's scoring proposal under the guidelines, finding that the Board had failed to consider certain aggravating factors that warranted the imposition of additional points. Among other things, the court determined that "this [d]efendant's quantity of possessed child pornographic images, as well as his willingness to retain such materials in his com-

puter over an extended period of time, increases the danger of both acting upon his perverted sexual fantasies and increasing his likelihood to reoffend." Noting that it had "carefully considered the [d]efendant's request for a downward departure," the court found that although defendant had a "large and lovely family" and had been "young at the time the child pornography was downloaded," those mitigating factors were outweighed by defendant's possession of numerous pornographic files featuring children, his failure to delete those files, his inappropriate work environment and "his reported lack of candor during the evaluation by Dr. Heffler and his associates." The court said, "Under all of the circumstances, this Court finds that the [d]efendant has not made a sufficient showing of facts or circumstances so as to warrant a downward departure, at this time." Defendant appealed.

The Appellate Division unanimously affirmed the SORA court's order (see People v Gillotti, 104 AD3d 1155, 1155 [4th Dept 2013]). The Appellate Division concluded that the SORA court had correctly assessed the relevant points under the guidelines (see id. at 1155). The court further found that defendant had not presented "clear and convincing evidence of special circumstances justifying a downward departure" (id. [internal quotation marks omitted]). We granted defendant leave to appeal (21 NY3d 858 [2013]) and now reverse and remit to the Appellate Division for application of the correct standard of proof to defendant's departure request.

*People v Fazio*

In April 2006, the legal department of Yahoo, Inc., notified the police in Delaware County, Pennsylvania, that a local resident, who turned out to be defendant George Fazio, had uploaded child pornography files to a Yahoo website. After an investigation, the police arrested defendant and seized his computer, which contained roughly 20 pornographic images and movies featuring children, some of whom were less than 11 years old. Defendant eventually pleaded guilty to two counts of sexual abuse of children (see 18 Pa Cons Stat § 6312 [c]). Upon his release from prison, Pennsylvania authorities evaluated defendant's case to determine his registration status under Pennsylvania's sex offender registration law. An examiner concluded that defendant had met several statutory criteria indicative of a risk of reoffense, including the victimization of multiple individuals and having a stranger relationship to the victims.

In 2011, defendant moved to New York, where he was required to register under SORA. Accordingly, the Board prepared an RAI and case summary regarding defendant. The Board assessed defendant points under the following guidelines factors: factor 5, age of victim (30 points for defendant's victims being 10 years old or younger); and factor 14, supervision (15 points for defendant's release without supervision). Based on that total score of 45 points, the Board found defendant to be a risk level one sex offender and recommended no departures from that classification.

The People asked the SORA court to score 50 additional points under factors 3 and 7, which would render defendant a risk level two sex offender. In support of their request, the People provided the court with the Board's RAI, the Board's case summary, the Pennsylvania indictment, the Pennsylvania court's sentencing order, and the Pennsylvania examiner's report. Defendant objected to the assessment of points under factors 3 and 7, but he did not request a departure. At the conclusion of a SORA hearing, the court included in its risk assessment a score of 30 points under factor 3. The court did not make a definitive finding under factor 7, instead observing that even if defendant could not be assessed points under that factor, his total guidelines factor score was still 75 points, which was within the range for a risk level two classification. Thus, the SORA court adjudicated defendant a risk level two sex offender. Defendant appealed.

The Appellate Division unanimously affirmed the SORA court's order (see People v Fazio, 106 AD3d 1291 [3d Dept 2013]). Citing Johnson (11 NY3d 416 [2008], supra), the Appellate Division found that "[c]hildren depicted in pornographic images may be found to constitute multiple separate victims for the purposes of the Sex Offender Registration Act" (id. at 1291). The court concluded that, because there was clear and convincing proof that multiple children were depicted in the files defendant had possessed, the SORA court had properly scored points under factor 3, and the court upheld the SORA court's total guidelines point assessment (see id.). Accordingly, in the Appellate Division's view, defendant had been correctly adjudicated a risk level two sex offender (see id.). In a footnote, the court observed that, after the SORA hearing in this case, the Board released a position statement "proposing review of additional factors in future cases, specifically addressing the differences among child pornography offenders" (id. at 1291 n).

We granted defendant leave to appeal (22 NY3d 852 [2013]) and now affirm.

## II

### A

Under SORA, the Board "shall develop guidelines and procedures to assess the risk of a repeat offense by [a] sex offender and the threat posed to the public safety" (Correction Law § 168-*l* [5]). The guidelines "shall be based upon," among other things, "criminal history factors to be considered in determining risk, including" the "relationship between such sex offender and the victim" (Correction Law § 168-*l* [5] [b] [i]). Based on the guidelines, the Board must make a "recommendation" regarding the offender's risk level classification (Correction Law § 168-*l* [6]). "[A]pplying the guidelines," a reviewing court at a SORA hearing must determine the offender's risk level classification by either accepting the Board's recommendation or rejecting that recommendation in favor of a different risk level classification supported by the evidence presented at the hearing (Correction Law § 168-n [2], [3]).

Guidelines factors 3 and 7 are especially significant to the appeals before us. Factor 3 reads as follows:

> **"Factor 3: Number of Victims**
>
> "1: There were two victims (20 pts)
>
> "2: There were three or more victims (30 pts)" (Guidelines, factor 3).

In *People v Poole* (90 AD3d 1550 [4th Dept 2011]), the Fourth Department held that points may be imposed under factor 3 based on the number of children depicted in child pornography files possessed by a child pornography offender (*see id.* at 1550). Factor 7 states:

> **"Factor 7: Relationship Between Offender and Victim**
>
> "The offender's crime (i) was directed at a stranger or a person with whom a relationship had been established or promoted for the primary purpose of victimization or (ii) arose in the context of a professional or avocational relationship between the offender and the victim and was an abuse of that relationship (20 pts)" (Guidelines, factor 7).

As previously discussed, we held in *Johnson* (11 NY3d 416 [2008], *supra*) that a SORA court may assign points to a child pornography offender under factor 7 if the offender was not personally acquainted with the children shown in the relevant videos or images prior to committing the subject offense (*see Johnson*, 11 NY3d at 420-421). Notably, though, even where the law and the evidence warrant a particular risk level classification based on the defendant's guidelines factor score, including points assessed pursuant to factors 3 and 7, the SORA court may decide that there should be an upward or downward departure to a higher or lower risk level classification if it "concludes that there exists an aggravating or mitigating factor of a kind, or to a degree, that is otherwise not adequately taken into account by the guidelines" (Guidelines at 4; *see Johnson*, 11 NY3d at 420-421).

In 2012, after we decided *Johnson*, the Board issued a document entitled "Scoring of Child Pornography Cases Position Statement" (the Position Statement). In that statement, the Board observes that *Johnson* and *Poole* authorize the assessment of points under factors 3 and 7 in child pornography cases, and the Board states that,

> "as the Court in Johnson notes, scoring all pornography cases for stranger relationship (and similarly in Poole scoring for three or more victims) produces an unintended, anomalous result as the majority of offenders convicted of child pornography offenses will be scored the same when there are clearly vast differences amongst these types of offenders."

The Board declares that, "[t]o address the *[Johnson]* Court's concern" and more accurately determine an offender's risk level, "the Board" will "continue to score either 20 or 30 points for the youngest age depicted in the images under the 'Current Offense' category." The Board further states that it will "depart from the presumptive [risk] level when appropriate" based on a non-exhaustive list of factors including:

> "the number of images possessed (10,000 is more concerning than 6 months)[;] paid subscriptions to access child pornography[;] categorized/organized material in their child pornography collection[;] absence of adult sexual relationships[;] emotional identification with children[;] allegations regarding sexual contact with children[;] nature of images (i.e. sadomasochistic)[;] reinforcement of deviant sexual arousal by masturbating to these images."

The Board goes on to say that it "remains concerned about child pornography offenders, and in the majority of cases, believes that they have a sexually deviant interest in children which poses a significant risk to public safety; however, [it] recognizes that each person convicted of a child pornography offense poses risks that are unique to that individual." The Board points out that "[t]hese images are in essence crime scene photos of children being sexually abused, and the increased demand for these images results in further sexual victimization of children."

B

■■ With these principles in mind, we first turn to defendants' complaints about the imposition of points pursuant to factors 3 and 7. Defendants do not dispute the sufficiency of the People's proof at their SORA hearings. Instead, defendants challenge the legal viability of imposing points under factors 3 and 7 in child pornography cases such as theirs. As a threshold matter, however, in *People v Gillotti*, defendant did not preserve his claim that the court should not have imposed points under factor 7 based on his stranger relationship to the victims. Since defendant never specifically opposed the People's request for the scoring of points under factor 7 on the theory that the assessment of such points is inappropriate in a child pornography case, defendant's claim in that regard is unpreserved. In *People v Fazio*, defendant preserved his challenge to the People's proposed imposition of points under factor 7. As we made clear in *Johnson*, however, the plain terms of factor 7 authorize the assessment of points based on a child pornography offender's stranger relationship with the children featured in his or her child pornography files, and thus points can be properly assessed under that factor due to an offender's lack of prior acquaintance with the children depicted in the files (*see Johnson*, 11 NY3d at 420-421).

■ Moreover, *Johnson* and the unambiguous terms of factor 3 compel rejection of defendants' challenges to the courts' assignment of points to them under that factor. In *Johnson*, we explained that the children featured in child pornography are victims for SORA purposes not only under factor 7, but also under the guidelines factors in general. We observed that "of course they [a]re" victims because "[t]he whole point of the child pornography statutes is to protect children like these from exploitation by pornographers—an exploitation to which de-

fendant, by consuming the pornographers' product, contributed" (*id.* at 420).

In light of this general principle, the children depicted in child pornography are necessarily counted as victims under factor 3, and nothing in that factor's plain terms suggests otherwise. After all, factor 3 permits the assessment of 30 points whenever "[t]here were three or more victims" involved in a defendant's current sex crime (Guidelines, factor 3), and the Board's official commentary states, "This category focuses upon the number of people whom the offender victimized," adding, "The existence of multiple victims is indicative of compulsive behavior and is, therefore, a significant factor in assessing the offender's risk of reoffense and dangerousness" (Guidelines at 10). Given that factor 3 draws no distinction between victims of child pornography offenses and victims of other sex crimes, the plain language of that factor and its associated commentary permit a SORA court to score points against an offender based on the number of different children featured in his or her child pornography files, and the courts here properly assessed those points.

Indeed, defendants seemingly acknowledge that the guidelines themselves permit the assessment of points under factor 3 in child pornography cases, and they do not meaningfully distinguish the instant cases from *Johnson*. Rather, they primarily argue that: (1) the "hands-off" nature of their child pornography offenses renders them less dangerous to the public and less likely to commit "hands-on" sex offenses than other offenders, such that scoring under factors 3 and 7 necessarily results in an improper risk level classification in their cases; and (2) the Board's Position Statement bars a court from scoring points under factors 3 and 7. We reject both contentions.

Defendants' assertions minimize the risks posed by their conduct, which are not overestimated by the guidelines factors. Although we have used the colloquial term "child pornography" to describe the nature of defendants' offenses here, that description does not capture the uniquely harmful character of these crimes. As the United States Department of Justice has noted, "many experts in the field believe that use of that term [child pornography] contributes to a fundamental misunderstanding of the crime—one that focuses on the possession or trading of a picture and leaves the impression that what is depicted in the photograph is pornography" (U.S. Department of Justice, Report to Congress, *The National Strategy for Child*

*Exploitation Prevention and Interdiction* at 8 [Aug. 2010], available at http://www.justice.gov/psc/docs/natstrategyreport.pdf [accessed May 14, 2014] [hereinafter DOJ report]). In fact, though, "[c]hild pornography is unrelated to adult pornography; it clearly involves the criminal depiction and memorializing of the sexual assault of children and the criminal sharing, collecting, and marketing of the images" (DOJ report at 8-9).

In its recent decision in *Paroline v United States* (572 US —, 134 S Ct 1710 [2014]), the Supreme Court of the United States underscored this point. Addressing a victim's restitution request in a child pornography case, the Supreme Court discussed the great harm inflicted by those who download child pornography files from the Internet, saying:

> "The demand for child pornography harms children in part because it drives production, which involves child abuse. The harms caused by child pornography, however, are still more extensive because child pornography is a permanent record of the depicted child's abuse, and the harm to the child is exacerbated by its circulation. Because child pornography is now traded with ease on the Internet, the number of still images and videos memorializing the sexual assault and other sexual exploitation of children, many very young in age, has grown exponentially" (*Paroline*, 572 US —, 134 S Ct at 1716-1717 [internal quotation marks, punctuation and citations omitted]).

The Court went on to recount the story of a particular victim, whose travails are emblematic of the unique danger to the well-being of the public caused by child pornography offenses. The child victim, now grown, explained:

> "Every day of my life I live in constant fear that someone will see my pictures and recognize me and that I will be humiliated all over again. It hurts me to know someone is looking at them—at me—when I was just a little girl being abused for the camera. I did not choose to be there, but now I am there forever in pictures that people are using to do sick things. I want it all erased. I want it all stopped. But I am powerless to stop it just like I was powerless to stop my uncle . . . . My life and my feelings are worse now because the crime has never really

stopped and will never really stop . . . . It's like I am being abused over and over and over again" (*id.* at —, 134 S Ct at 1717).

Given that child pornography offenders substantially harm the mental health of abused children and, via the consumption of child pornography, encourage others to commit the hands-on sexual abuse needed to produce that material, it is difficult to credit defendants' claims that, due to their failure to personally physically abuse children, the risk of harm caused by their offenses should not be accounted for in the manner authorized by the plain language of factors 3 and 7. Although those aggravating factors may not represent the exact same risks in child pornography cases as in those involving physical contact, the presence of those factors in child pornography cases increases the offender's potential to psychologically harm a greater number of children to a greater degree. The guidelines may account for the variable risk that certain child pornography offenders who have an unusually strong compulsion to consume and distribute child pornography will provide exceptional support to an illicit trade that physically and psychologically harms children.

Regarding factor 3, under which defendants received the points that proved decisive in their respective risk level classifications, the limited application of that factor to certain child pornography cases, such as *Gillotti* and *Fazio*, is consistent with logic and the scientific concepts underlying part of Dr. Heffler's report in *Gillotti*. In particular, Dr. Heffler explained that child pornography offenders generally seek out more arousing stimuli after images they have previously viewed have failed to create the desired sexual arousal. It follows that, craving the novelty of viewing previously unseen children, some defendants possessing images of multiple child victims may be in an especially compulsive cycle that will make those particular defendants more likely to commit additional psychologically harmful child pornography offenses.[2] Thus, factor 3 accurately assesses the risk of reoffense created by that compulsive behavior because it

---

**2.** According to the Board's Position Statement, impulsive behavior, sexual interest in children (*see* R. Karl Hanson & Kelly Morton-Bourgon, *Predictors of Sexual Recidivism: An Updated Meta-Analysis 2004-02* at 1, 9, 15-17, Public Safety and Emergency Preparedness Canada, available at http://www.static99.org/pdfdocs/hansonandmortonbourgon2004.pdf [accessed May 13, 2014]), and compulsive behavior such as downloading many child pornography files and cataloging them (*see* Jim Tanner, *Digital Technology Use Factors Which Indicate Increased Sex Offender Investment in Digital*

authorizes the scoring of points based on the number of children portrayed in child pornography images and videos. And, the number of children may often reflect the sheer quantity of child pornography possessed by an offender, which the Board's Position Statement recognizes to be an aggravating factor in child pornography cases.[3]

Accordingly, while a departure may be warranted in a variety of child pornography cases, scoring under factor 3 does not necessarily overestimate a child pornography offender's risk of further exploiting children. We must caution that, at this time, the relationship between an offender's child pornography offenses and the likelihood he or she will commit hands-on offenses is uncertain due to the continuing development of scientific research in this area; some child pornography offenders subsequently commit hands-on offenses, but the manner in which that minority of offenders' consumption of child pornography contributes to their contact offenses, if at all, has not been fully understood. Any current and future research bearing out a strong correlation between the two types of offense may further support the imposition of points under the guidelines, whether under factor 3 or other factors, and likewise further

*Sexual Content* at 4, 7, KBSolutions Inc. [2010], available at http://www.kbsolutions.com/KBS14Factors.pdf [accessed May 13, 2014]) significantly increase an offender's likelihood of sexual recidivism. As a whole, then, these studies suggest that an offender who compulsively seeks out pornographic depictions of multiple children, usually by downloading multiple files on the Internet, has a significantly increased likelihood of reoffense, and factor 3 properly evaluates that risk in certain cases.

3. We disagree with the partial dissent's contention that registration of child pornography offenders rarely benefits the community (*see* op of Smith, J., dissenting in part at 866). The registration of child pornography offenders serves to raise awareness of the offender's conviction for viewing sexual images of children among the community and particularly local parents, who may well want to know about such a conviction in order to limit their children's access to the offender's household. Upon learning of the offender's registration and the nature of the offense, parents and community members may take precautions against the possible introduction of child pornography to children and other adults that may result from the offender's presence and activities in the community. Along those lines, by being compelled to register, the offender will be somewhat deterred from engaging in any further offenses, knowing that the community is alert to his or her proclivities and will not easily let any future sexual misconduct go undetected. Without registration of child pornography offenders, we leave these crimes in the shadows, potentially causing children and adults to underestimate the true dangers and terrible consequences for children and our society generally as a result of the offenders' criminal acts. These considerations logically support the legislature's decision to classify a broad swath of sex offenses, including child pornography crimes, as registerable offenses under SORA (*see* Correction Law § 168-a [2]).

research to the contrary may create additional justification for departures and other scoring options unequivocally promulgated by the Board via guidelines amendments. At bottom, there is nothing inherent in child pornography offenses that convinces us to completely ignore the plain language of the guidelines which authorize the scoring of points under factors 3 and 7 against child pornography offenders.

■ Contrary to defendants' claims, the Board's Position Statement does not abrogate a SORA court's authority under the statute and the guidelines to assess child pornography offenders points under factors 3 and 7. The Position Statement is not on the same footing as the guidelines because SORA neither mentions a "position statement" nor attributes any legal significance to that document. Rather, SORA requires a court to "apply[ ] *the guidelines*" to determine an offender's risk level classification (Correction Law § 168-n [2] [emphasis added]). Thus, while the statute mandates that the court follow the guidelines, the court has no statutory obligation to follow or consider a position statement. To the extent defendants suggest that the Board's Position Statement is an actual or constructive amendment to the guidelines, the document itself says nothing of the sort, and the Board has not otherwise proclaimed the document to be an amendment to the guidelines.[4]

In fact, in the Position Statement, even the Board does not purport to follow the scoring approach advocated by defendants. Specifically, the Board does not state that it will never assign a defendant points for victimizing multiple children or strangers depicted in child pornography, nor does the Board assert that a court cannot or should not assess such points. Rather, in the statement, the Board expressly seeks to address concerns we voiced in *Johnson*, a child pornography case in which we *approved* the assessment of points under factor 7 while noting that any unintended result or excessive risk assessment may be corrected via a departure. The Board further indicates that it will continue to treat the children depicted in pornographic images as victims for purposes of scoring under the guidelines factors, albeit primarily by scoring points based on the age of the

---

4. In *People v Marrero* (37 Misc 3d 429 [Sup Ct, NY County 2012, Daniel Conviser, J.]), a SORA court expressed skepticism of the guidelines and endorsed what it believed to be the Position Statement's policy of excluding the consideration of factors 3 and 7 in child pornography cases. Tellingly, the court acknowledged that the legal effect of the statement and the Board's rationale for promulgating it are unclear (*see Marrero*, 37 Misc 3d at 434-435).

victimized children under factor 5. Aside from its references to *Johnson* and *Poole*, the Board says nothing about factors 3 and 7.

It is true that, reading between the lines of the statement, one can sense that the Board is skeptical of scoring points under factors 3 and 7. But the Board has not chosen to translate that skepticism into a bright-line rule or an amendment to the guidelines categorically forbidding point assessments under factors 3 and 7 in cases like the ones before us. If the Board had intended to change scoring under factors 3 and 7, it could have easily revised the guidelines, as it has done in the past. In the absence of such action, we must assume that the Board did not intend to establish the rule advocated by defendants here. Moreover, to the extent the Board maintains a practice of declining to assess points against child pornography offenders pursuant to factors 3 and 7, a SORA court is not bound by that practice, for Correction Law § 168-n (3) expressly authorizes the court to classify an offender at a higher risk level than the one recommended by the Board.

In reaching this conclusion, we recognize, as the partial dissent does (*see* op of Smith, J., dissenting in part at 866-869), that scoring points under factors 3 and 7 may overestimate the risk of reoffense and danger to the public posed by quite a few child pornography offenders. But we think it best to address that concern through the departure process rather than ignoring the plain language of the guidelines in favor of the vague and non-authoritative Position Statement. At the same time, in deciding a child pornography offender's application for a downward departure, a SORA court should, in the exercise of its discretion, give particularly strong consideration to the possibility that adjudicating the offender in accordance with the guidelines point score and without departing downward might lead to an excessive level of registration.

In sum, because the guidelines' plain language allows a court to assess points pursuant to factors 3 and 7 in child pornography cases and the Position Statement does not forbid that practice, the SORA courts here properly assigned points to defendants pursuant to factor 3 and were authorized to do the same under factor 7.

## C

In *Gillotti*, defendant contends that the Appellate Division erred by reviewing the SORA court's rejection of his request for

a downward departure under a clear and convincing evidence standard of proof.[5] We agree and conclude that, in reviewing the SORA court's departure decision, the Appellate Division should have determined whether defendant proved the existence of the alleged mitigating factors underlying his departure request by a preponderance of the evidence.

Under SORA, a court must follow three analytical steps to determine whether or not to order a departure from the presumptive risk level indicated by the offender's guidelines factor score. At the first step, the court must decide whether the aggravating or mitigating circumstances alleged by a party seeking a departure are, as a matter of law, of a kind or to a degree not adequately taken into account by the guidelines (*see* Guidelines at 4; *People v Vaillancourt*, 112 AD3d 1375, 1376 [4th Dept 2013], *lv denied* 22 NY3d 864 [2014]; *see also Johnson*, 11 NY3d at 418, 420-422 [treating the interpretation of guidelines factors as a legal issue]). At the second step, the court must decide whether the party requesting the departure has adduced sufficient evidence to meet its burden of proof in establishing that the alleged aggravating or mitigating circumstances actually exist in the case at hand (*see* Correction Law § 168-n [3]; Guidelines at 4, 7; *see also People v Balic*, 12 NY3d 563, 570-577 [2009] [analyzing whether reliable hearsay met clear and convincing standard of proof and therefore warranted an upward departure]). If the party applying for a departure surmounts the first two steps, the law permits a departure, but the court still has discretion to refuse to depart or to grant a departure. Thus, at the third step, the court must exercise its discretion by weighing the aggravating and mitigating factors to determine whether the totality of the circumstances warrants a departure to avoid an over- or under-assessment of the defendant's dangerousness and risk of sexual recidivism (*see People v Knox*, 12 NY3d 60, 70 [2009]; *Johnson*, 11 NY3d at 421).

Central to defendant Gillotti's case is the burden of proof to be carried by a defendant seeking a downward departure at the second analytical step. In that regard, because Correction Law § 168-n (3) compels the People to prove the existence of facts supporting a defendant's overall risk level classification by clear

---

5. In *Fazio*, to the extent defendant argues that the SORA court should have granted him a downward departure, that claim is unpreserved because defendant never asked the SORA court to order a downward departure (*see Johnson*, 11 NY3d at 421-422; *see also People v Windham*, 10 NY3d 801, 802 [2008]).

and convincing evidence, the People cannot obtain an upward departure pursuant to the guidelines unless they prove the existence of certain aggravating circumstances by clear and convincing evidence (*see People v Cruz*, 111 AD3d 685, 685 [2d Dept 2013], *lv denied* 22 NY3d 860 [2014]; *People v Collins*, 104 AD3d 1220, 1220-1221 [4th Dept 2013], *lv denied* 21 NY3d 855 [2013]; *People v Gauthier*, 100 AD3d 1223, 1225 [3d Dept 2012]; *see also Balic*, 12 NY3d at 570-577; *see generally* Guidelines at 4-5). By contrast, neither the guidelines nor Correction Law § 168-n (3) assigns any particular burden of proof to a defendant who asks for a downward departure. Given the lack of express statutory or regulatory guidance on the question of a defendant's burden of proof at the second stage of the departure analysis, the departments of the Appellate Division are split as to whether the defendant must prove the existence of alleged mitigating factors by a preponderance of the evidence or by clear and convincing evidence.

The departments applying the clear and convincing evidence standard to a defendant's request for a downward departure have not directly stated a rationale for that approach, but they seem to have reached this conclusion on the theory that, because the People must meet the clear and convincing evidence standard to obtain a departure, the same rule should be applied to the defendant to ensure the even-handed application of the statute and the guidelines (*see People v Bogan*, 115 AD3d 1359, 1359 [4th Dept 2014]; *People v Carter*, 106 AD3d 1202, 1204 [3d Dept 2013]; *People v Sally*, 105 AD3d 567, 568 [1st Dept 2013], *lv denied* 21 NY3d 861 [2013]). Taking the opposite view in *People v Wyatt* (89 AD3d 112 [2d Dept 2011], *lv denied* 18 NY3d 803 [2012]), the Second Department concluded that a defendant seeking a downward departure must prove the facts warranting such a departure only by a preponderance of the evidence (*see id.* at 119-126). The court reasoned that the statute imposes on the People the burden of proof by clear and convincing evidence largely to create an extra procedural protection against an excessive risk level classification and the resulting deprivation of the defendant's liberty, whereas the defendant does not have to meet the same burden to obtain a downward departure because such a departure does not impede any equivalent governmental interest (*see id.* at 126-128).

In light of the considerations of consistency and equivalency reflected in the Appellate Division decisions adopting the clear and convincing evidence standard in the downward departure

context, it would not be entirely unreasonable to apply that standard to defense departure applications. However, due to the statute's failure to expressly set forth a standard of proof applicable to a defendant's request for a downward departure, we must look to the nature of a SORA proceeding and the policy underlying the statute to determine the proper burden of proof.

In most civil proceedings, a party seeking relief need only establish entitlement to such relief by a preponderance of the evidence, and logically the same standard should apply to a defendant's request for a downward departure in a civil SORA hearing. In that regard, a SORA defendant asking for a downward departure essentially occupies the same position as a defendant raising an affirmative defense or attempting to rebut a presumption in any other civil proceeding; each type of defendant basically concedes that the plaintiff has met its burden of proof with respect to the essential elements of the cause of action, but each nonetheless seeks to prevent the plaintiff from obtaining an entirely favorable judgment by proving an additional circumstance that weighs against the granting of such relief. Furthermore, given that a defendant interposing an affirmative defense may prevail on that defense by a mere preponderance of the evidence in most civil cases, a SORA defendant should be allowed to obtain a downward departure by presenting the same quantum of proof (*see e.g. Property Clerk of Police Dept. of City of N.Y. v Harris*, 9 NY3d 237, 249 [2007] [where city proved prima facie case for impoundment, defendant had to rebut that showing by preponderance of evidence]; *Ward v New York Life Ins. Co.*, 225 NY 314, 322 [1919] [in civil cases, the party seeking relief generally must satisfy only the preponderance standard]).

In addition to these considerations, we agree with the *Wyatt* court that defendant's statutorily protected interest in being free from excessive government monitoring and stigmatization weighs decisively in favor of applying the preponderance of the evidence standard to a defendant's request for a downward departure (*see Wyatt*, 89 AD3d at 126-128). Specifically, defendants have a recognized liberty interest "in not being required to register under an incorrect label" (*Knox*, 12 NY3d at 66). And, while the government has a countervailing interest in "the protection of the community against people who have shown themselves capable of committing sex crimes" (*id.* at 67), SORA permits the government to vindicate that interest only by proving facts indicative of sexual recidivism by the heightened stan-

dard of clear and convincing evidence. In placing this exceptional burden on the People—a burden not otherwise mandated by constitutional due process (*see In re W.M.*, 851 A2d 431, 453-454 [DC 2004]; *see also People v Escobar*, 61 NY2d 431, 439-440 [1984])—the legislature evidently sought to carefully guard a defendant's liberty interest. Consistent with that legislative intent and the general practice in civil cases, we hold that a defendant must prove the existence of the mitigating circumstances upon which he or she relies in advocating for a departure by a mere preponderance of the evidence.

Here, with respect to the first step of the departure analysis, the lower courts and the parties agree that defendant Gillotti sought a downward departure based on alleged mitigating circumstances which are, as a matter of law, of a kind or to a degree not adequately considered by the guidelines, including the statistically low likelihood that a child pornography offender will commit hands-on sex offenses in the future, defendant's purported completion of an anger management program and defendant's alleged past participation in volunteer activities reflective of his empathy and good character.[6] However, at the second analytical step, the Appellate Division expressly concluded that defendant had failed to submit "clear and convincing evidence of special circumstances justifying a downward departure" (*Gillotti*, 104 AD3d at 1155 [internal quotation marks omitted]), thereby impermissibly subjecting the SORA court's decision to credit parts of defendant's evidence to review under the heightened clear and convincing evidence standard. Therefore, we remit the matter to the Appellate Division for application of the proper standard of proof. If the Appellate Division determines that defendant met that standard, it may proceed to the third step of the departure analysis by reviewing the discretionary aspect of the SORA court's departure decision.

### III

In *People v Fazio*, the SORA court properly adjudicated defendant a risk level two sex offender based on his total guidelines point score, including points assessed under factor 3, and the Appellate Division correctly affirmed the SORA court's order. In *People v Gillotti*, the SORA court correctly calculated

---

**6.** However, as Dr. Heffler noted, some of defendant's reported volunteer activities involved children, and thus his participation in those specific activities might be considered an aggravating factor to the extent it reflects an unhealthy interest in children.

defendant's guidelines point score, but the Appellate Division erred in its review of the SORA court's departure decision. Accordingly, in *People v Fazio*, the order of the Appellate Division should be affirmed, without costs. In *People v Gillotti*, the order of the Appellate Division should be reversed, without costs, and the matter remitted to that court for further proceedings in accordance with this opinion.

SMITH, J. (dissenting in part). I agree that the order of the Appellate Division in *People v Gillotti* should be reversed for the reasons stated in section II-C of the majority opinion. I otherwise dissent, because I think the majority opinion is flawed in its discussion of guidelines factors 3 and 7 and of the Board of Examiners' Position Statement. Before discussing these topics, however, I will say a few words about the overall problem presented by the application of the Sex Offender Registration Act (Correction Law art 6-C) (SORA) to people who commit child pornography offenses.

Of course I agree—who does not?—that child pornography is an enormous evil, "uniquely harmful" to its victims (majority op at 855). And while I have expressed elsewhere my doubt that severe punishment of "minor and peripheral" consumers will be an effective way of combating the evil (*People v Kent*, 19 NY3d 290, 312-313 [2012, Smith, J., concurring]), I am not re-opening that argument today. I do not suggest that the defendants before us were minor offenders, that they did not deserve criminal punishment, or that the punishments given them were too severe. Perhaps they were too light.

I

But SORA's purpose is not to punish. It is to protect the community (*People v Windham*, 10 NY3d 801, 802 [2008]; *Doe v Pataki*, 120 F3d 1263 [2d Cir 1997], *cert denied* 522 US 1122 [1998]). To that end, information is made available to law enforcement authorities and to members of the public, telling them where people who have committed sex offenses may be found. In general, the higher an offender's risk level, the more information is made available, the more widely it is disseminated, and the longer the offender's registration will last (Correction Law §§ 168-*l* [6]; 168-h). An offender's risk level designation under SORA is not an expression of outrage at the heinousness of a crime, or an attempt to make the offender suffer for what he has done. It is an attempt to gauge the likelihood that stringent reporting and notification requirements are needed to protect the public from future sex crimes.

A moment's thought will show that sex offender registration is ill-suited to preventing recidivism by consumers of child pornography. The basic idea of SORA is that, knowing who and where the sex offenders are, people will take precautions to protect themselves and their children from them, and law enforcement authorities will be better able to make the community safe. But even if everyone in the world knows who and where a consumer of child pornography is, that will not stop him from downloading pictures from the Internet. I do not say that SORA registration for consumers of child pornography will never do any good at all; I can imagine cases in which it would do some good. And no one argues, or in light of the statute's plain terms could argue, that such offenders should not have to register. But the vast majority of them should be classified at level one. The resources that go into the more intensive monitoring of level two and level three SORA registrants can be more usefully expended in keeping track of so-called "contact offenders"—for example rapists, and abductors of children.

The majority opinion does not take account of this basic point. Its premise seems to be that because child pornography is bad any negative consequences visited on those who provide a market for it must be good. I think that this approach is more likely to produce emotional satisfaction than to protect any children.

## II

I turn now to the more specific flaws of the majority opinion—its handling of factors 3 and 7 and the Position Statement. I agree with the majority that factors 3 and 7, as written, require the assessment of a total of 50 points against each of these defendants—and against most, perhaps virtually all, consumers of child pornography. It is equally clear to me that these factors were not devised with child pornography cases in mind, and that their application to such cases produces anomalous, unintended consequences. Putting aside the effect of the Board's Position Statement, I think the correct way of dealing with this problem is the one we outlined in *People v Johnson* (11 NY3d 416 [2008]): the points must be assessed, but courts should use their discretion to depart from the risk level indicated by a defendant's point total, to the extent necessary to negate the effect of these two factors. The Position Statement, it seems to me, offers a simpler solution: courts should defer to the Board's choice not to score points for these factors in child pornography cases.

*Johnson* dealt with factor 7, which requires the assessment of 20 points against a sex offender whose crime "was directed at a stranger." The inherent absurdity of applying this factor in cases involving defendants like those before us is explained in *Johnson*. The victims in such cases—the children depicted—are almost always strangers to the offenders (and in the rare cases where they are not it is not good news) (*see Johnson*, 11 NY3d at 419). Thus the effect of factor 7 is simply to add an automatic 20 points in virtually every child pornography case.

The solution, as *Johnson* makes clear, is to take account of the anomaly in ruling on a defendant's request for a downward departure—to recognize, in other words, that the defendant's point total includes 20 points that in common sense should not be there (11 NY3d at 420-421). This should mean, in almost every case involving a consumer of child pornography, that a downward departure will be granted where the factor 7 points make a difference to the defendant's presumptive risk level, unless some other facts, not adequately taken into account by the risk assessment instrument, happen to justify independently the risk level indicated by the defendant's point total.

A Supreme Court Justice of much experience and impressive erudition on the subject of sex offender registration (*see People v McFarland*, 29 Misc 3d 1206[A], 2010 NY Slip Op 51705[U] [Sup Ct, NY County 2010, Conviser, J.]) understands *Johnson* essentially as I do. After quoting our observation that the application of factor 7 to child pornography cases produces "a seemingly anomalous result, one the authors of the Guidelines may not have intended or foreseen" (11 NY3d at 421), and after pointing out a reason for the anomaly—"[t]he simple possession of child pornography was not a crime . . . when the 'stranger' factor was written"—Justice Conviser said:

> "Despite its concerns, the Court of Appeals in *Johnson* held that points for stranger victims had to be assessed under the RAI in the case before it because to do otherwise would be to 'distort the text of [RAI] factor 7 to avoid an unjust result in cases like this.' (11 NY3d at 420.) The remedy, the Court held, in cases where the RAI's point scoring system led to an inappropriate result was for a court to depart downward to an appropriate risk level" (*People v Marrero*, 37 Misc 3d 429, 433 [Sup Ct, NY County 2012]).

This approach should be equally applicable to factor 3, though the anomaly that factor creates is slightly less obvious. Factor 3

scores points based on "Number of Victims" (Sex Offender Registration Act: Risk Assessment Guidelines and Commentary [2006]). The majority is at pains to demonstrate, and I do not dispute, that the number of children that a consumer of child pornography has exploited is relevant to the danger that he presents (majority op at 857-858). Certainly, "the number of children may often reflect the sheer quantity of child pornography possessed by an offender," and this may indeed be "an aggravating factor in child pornography cases" (*id.* at 858). But the problem, which the majority completely ignores, is that the maximum number of victims that factor 3 contemplates is *three*—a maximum that carries a 30-point assessment, and that will surely be hit in virtually every child pornography case (except, perhaps, in the case of offenders, if there are any, who look only at computer-generated images, not pictures of real people). Far from taking account of the "sheer quantity" of pornography an offender possesses, factor 3 treats the offender who possesses three pictures the same as one who possesses 3,000. It is obvious that factor 3, like factor 7, was not devised with child pornography in mind; that factor, like factor 7, should be negated by granting a downward departure (absent some countervailing facts) whenever factor 3 points are decisive in fixing an offender's presumptive risk level.

Another experienced Supreme Court Justice, also relying on what I think is a correct interpretation of *Johnson*, has remarked:

> "The language of the sex offender classification rules assigns points to possessors of child pornography for the 'number' of victims, and the 'stranger' classification of victims, in a way that was intended by the authors of the guidelines to apply to physical contact, and not to defendants who possessed and shared child pornography. The resultant language will typically add 50 points to the sex offender totals of those who possess child pornography, whether or not they are as dangerous as physical offenders. As a result, many possessors of child pornography who are not serious threats to the community will presumptively be classified as level two offenders. Since this court does not think that result would be consistent with the intent of the authors of the SORA guidelines it anticipates that many SORA applications made as to such defendants should result

in downward departures to level one" (*People v Yen*, 33 Misc 3d 1234[A], 2011 NY Slip Op 52240[U], \*4 [Sup Ct, Kings County 2011, Dwyer, J.]).

I think that Justices Conviser and Dwyer are right in thinking that both common sense and our decision in *Johnson* should make downward departures the norm in most child pornography cases. But it also seems to me (as it did to Justice Conviser in *Marrero*) that the Board's Position Statement opens the door to a more direct approach. I concede that the wording of the Position Statement is very unclear, in the ways pointed out by today's majority (majority op at 859-860) and also by Justice Conviser in *Marrero* (37 Misc 3d at 433-435). I would be much happier if the Board had simply amended the guidelines—as it has the power to do—to make factors 3 and 7 inapplicable in cases of this kind, while perhaps devising other factors that can be meaningfully applied in child pornography cases.

But it is clear that the Board itself thinks it has in substance amended the guidelines. It has, as these cases illustrate, stopped scoring points for factors 3 and 7 where the offender is a consumer of child pornography. I agree that this contradicts the guidelines' literal language. But where the literal language leads to a result that makes no sense, and the author of the language—which has the power to amend it—declines to read it literally, should courts insist on overruling the author and reaching the irrational result? Like Justice Conviser (*Marrero*, 37 Misc 3d at 435), I think the answer is no.

### III

I have outlined two possible approaches—what may be called the *Johnson* approach and the Position Statement approach—that can minimize or avoid the perverse effects of factors 3 and 7 in child pornography cases. It remains to consider the impact of each approach on the two cases now before us.

The *Johnson* approach, unfortunately, can have no impact on the appeal in *Fazio*, because in *Fazio*—as in *Johnson* itself (*see* 11 NY3d at 421)—defendant made no request for a downward departure. Thus under *Johnson* we would have to apply the literal language of factors 3 and 7 and affirm Fazio's level two designation. Fazio, like Johnson, would have to seek recourse in a new proceeding to modify his risk level designation (Correction Law § 168-*o* [2]; *see Johnson*, 11 NY3d at 422).

In *Gillotti*, on the other hand, a downward departure was sought. It should have been granted unless some countervailing

factor not taken into account by the guidelines—the sort of thing that might otherwise justify an *upward* departure—calls for placing Gillotti at level two or three. There is an argument that countervailing factors do exist, and if the courts below had so found on sufficient evidence, I would not disturb their risk level designation. It seems to me, however, that both County Court and the Appellate Division, in finding that Gillotti had not shown grounds for a downward departure, failed to recognize the implication of *Johnson* that a downward departure may, and normally should, be employed to negate the effect of factors 3 and 7 in child pornography cases. I would thus remit Gillotti's case not, as the majority does, to the Appellate Division, but to County Court, which should reconsider the case under the understanding of *Johnson* that I believe correct.

Under what I have called the Position Statement approach, both of the Appellate Division orders should be reversed, because in both cases defendants were wrongly charged with points under factors 3 and 7. In *Fazio*, I would simply order a level one designation—the result of Fazio's point score under the Position Statement as I would interpret and apply it. In *Gillotti*, the point score under the Position Statement approach would also yield a level one designation; but the Board, while submitting such a score, recommended an upward departure to level two. I would remit to County Court to consider that recommendation, and to consider the People's view on whether and to what extent an upward departure is warranted.

Judges GRAFFEO, READ, PIGOTT and RIVERA concur with Judge ABDUS-SALAAM; Judge SMITH dissents in part in an opinion in which Chief Judge LIPPMAN concurs.

In *People v Gillotti*: Order reversed, without costs, and case remitted to the Appellate Division, Fourth Department, for further proceedings in accordance with the opinion herein.

Judges GRAFFEO, READ, PIGOTT and RIVERA concur with Judge ABDUS-SALAAM; Judge SMITH dissents in an opinion in which Chief Judge LIPPMAN concurs.

In *People v Fazio*: Order affirmed, without costs.