Garcia, J.
(dissenting). Defendant pleaded guilty to, among other things, first-degree sodomy, second-degree rape, and first-degree sexual abuse, for sexually abusing four children: three boys under the age of 11 and a 12-year-old girl suffering from cerebral palsy. The Board of Examiners of Sex Offenders (the Board) and three lower courts all designated defendant a level three sex offender, posing a “high risk” of danger to the community. The majority now reverses this determination and presumptively classifies defendant as a level two, “moderate risk” offender. I dissent.
The Sex Offender Registration Act (SORA) was created “to protect the public from sex offenders” (People v Mingo, 12 NY3d 563, 574 [2009]). To that end, pursuant to SORA, a sex offender nearing release from incarceration receives a numerical risk level — ranging from level one (low risk) to level three (high risk) — based on a variety of risk factors set forth in the Sex Offender Guidelines (Sex Offender Registration Act: Risk Assessment Guidelines and Commentary [2006] [Guidelines]) created at the direction of the legislature (see Correction Law § 168-1). The sole issue in the instant appeal concerns whether the record contains clear and convincing evidence that risk factor 7 (“Relationship Between Offender and Victim”) applies.
I agree with the majority that “we must apply the Guidelines logically” and “as they are written” (majority op at 128-129). Accordingly, I cannot agree with the majority’s conclusion— contrary to the plain language of factor 7 — that defendant did not promote his relationship with any of his victims simply because those relationships were “preexisting” (majority op at 129).
I.
Risk factor 7 is designed to consider the “Relationship [b]e-tween [o]ffender and [v]ictim” (Guidelines, factor 7; see also People v Johnson, 11 NY3d 416, 420 [2008]). Specifically, factor 7 provides that an offender is assessed 20 points if “[t]he offender’s crime (i) was directed at a stranger or a person with whom a relationship had been established or promoted for the primary purpose of victimization or (ii) arose in the context of a *132 professional or avocational relationship between the offender and the victim and was an abuse of that relationship” (Guidelines, factor 7).
By its plain language, risk factor 7 covers a broad range of conduct. It covers, for instance, conduct that is “directed at a stranger,” as well as offenders who “established” a relationship for the “primary purpose of victimization” (id.). But factor 7 is not limited to these types of new or unfamiliar relationships; it also encompasses certain established, or preexisting, relationships. For instance, under subdivision (ii), factor 7 covers conduct involving abuse of “a professional or avocational relationship” between offender and victim (id.).
Even more broadly, under subdivision (i) — the provision at issue here — points are assessed under factor 7 not only where the offender “established” a new relationship with a victim, but also where the offender “promoted” an existing relationship for the “primary purpose of victimization” (id.). As the majority notes, the word “promote” has a well-known, commonly-understood meaning (majority op at 127). Necessarily, the factor’s use of the term “promoted” presumes a preexisting relationship; an offender cannot “promote [ ]” a relationship that does not exist (Guidelines, factor 7). To conclude otherwise would read “promoted” out of risk factor 7 altogether.
Yet the majority concludes that — by virtue of his “preexisting relationships” with the victims — defendant’s conduct is automatically excluded from risk factor 7 (majority op at 129). Not only does this conclusion contravene the plain language of the risk factor, but it undermines the precise goal of the Guidelines: to identify offenders that present a unique threat to public safety, whether based on “(i) the offender’s likelihood of reoffense,” or “(ii) the harm that would be inflicted if he did reoffend” (Guidelines at 2). As the Guidelines recognize, certain categories of sex offenses — by their very nature — present a high level of risk based on the “offender’s danger to the community” (Guidelines at 1). Because “the need for notification is enhanced” (majority op at 129), these high-risk offenses will generally trigger certain risk factors and, by design, will yield a higher total score. For instance, an offender convicted of first-degree rape “[b]y forcible compulsion” (Penal Law § 130.35 [1]) will — by and large — trigger a provision of risk factor 1 (“Use of Violence”), resulting in an assessment of at least 10 points (see Guidelines, factor 1).
*133 Child sex offenses similarly present a uniquely grave threat to public safety, warranting special attention under the Guidelines. This category of sex crimes poses a risk of extraordinary harm stemming from reoffense — an element that is given particular emphasis under the Guidelines: “It is important to note that the risk level seeks to capture not only an offender’s risk of reoffense but also the harm posed by a particular offender should he reoffend” (Guidelines at 2). The Guidelines therefore single out “the child molester” as a high-risk offender in light of the substantial “harm that would be inflicted” if a child molester were “to reoffend” (id.). Given their high-risk nature, cases involving child sexual abuse will generally trigger a number of risk factors, including, as relevant here, the “Relationship Between Offender and Victim” factor (Guidelines, factor 7). Accordingly, it is by design that “the vast majority of offenders against child victims” may be “assessed . . . points” under risk factor 7 (majority op at 128).
II.
The record is replete with clear and convincing evidence that defendant “promoted” his relationships with the child victims for the primary purpose of abusing them. Particularly when “look[ing] to the most serious wrongdoing” — as the Guidelines instruct (Guidelines at 6) — defendant’s conduct falls squarely within the plain language of risk factor 7.
As to one victim, the little girl, defendant’s confession specifies the precise moment that he began promoting the relationship for the primary purpose of victimizing her: “I then[,] while driving!,] told [the victim] that I had to tell her something that she should know. I told her that I fell in love with her.” Defendant continues:
“As time went on we slowly became closer and better friends, we would play around and tap kiss each other. She would ask me to get this for her and do that for her and bring this or that to her, and I would jump to do it for her . . . Somewhere down the line kissing became more serious.”
Defendant further describes how he planned a trip with her to Florida shortly after telling the young girl he was “in love” with her.
As to the fourth victim, a young boy who was not related to the other three victims, defendant describes in the “My Instant *134 Offense[s]” section of his “Relapse Prevention Plan” how he promoted his relationship with this victim:[1] “I selected the ten year old male victim as he became good friends with my [godson]. Access was made easier to this boy because he would enjoy visiting [my godson].” In another section, defendant continues: “My ten year old victim was beginning to be allowed to go places with people other than his parents. I made myself available to him as he was eager to get out, especially to spend time with his best friend, my [godson].”
In lieu of examining defendant’s relationship with each victim, as required by the risk factor, the majority — focusing on defendant’s relationship with the victims’ parents — imposes a blanket ban on “preexisting” relationships (majority op at 129).[2] For instance, with regard to the fourth victim, there is no indication that defendant had much contact with the victim whatsoever before he began promoting the relationship for the primary purpose of facilitating the abuse. Nonetheless, the majority somehow concludes that defendant did not “promote [ ]” his relationship with this victim for the primary purpose of victimization, noting that defendant had a close and longstanding relationship with the victim’s parents (majority op at 127, 129-130).
Pursuant to its plain language, risk factor 7 is properly evaluated based on an individualized assessment of an offender’s conduct vis-a-vis his victim(s). On this record, there is clear and convincing evidence that defendant “promoted” his *135 relationships with these victims “for the primary purpose of victimizing]” them (Guidelines, factor 7).
III.
Given SORA’s compelling purpose — “to protect the public from sex offenders” — “an accurate determination of the risk a sex offender poses to the public is the paramount concern” {Mingo, 12 NY3d at 574). By needlessly limiting the plain language of risk factor 7, the majority inhibits SORA courts statewide from using the Guidelines in a manner that “fully capture [s] the nuances of every case” so that “the instrument will result in the proper classification” (Guidelines at 4).
Constrained from invoking the risk factors, SORA courts— tasked with reaching an assessment that accurately reflects the threat posed by a sex offender — are compelled, with increasing frequency, to resort to “[t]he departure concept,” an already “common aspect of SORA litigation” (see People v Wyatt, 89 AD3d 112, 119 [2d Dept 2011]). The departure concept not only distorts the scheme established by the Guidelines — which advise that departures should be “the exception” and “not the rule” (Guidelines at 4) — but also constrains appellate review of an offender’s risk level determination (see People v Knox, 12 NY3d 60, 70 [2009] [reviewing departure under “abuse of discretion” standard]).
In this case, the Board classified defendant “at a Level III (High) risk” for reoffending.[3] Both the Richmond County and Queens County sentencing courts agreed and adjudicated defendant a level three, sexually violent offender (see People v Cook, 129 NY3d 114 [2017] [decided herewith]). In reaching its determination, the Richmond County SORA court found clear and convincing evidence to support factor 7 points, concluding that “defendant brought that relationship to another level in order to accomplish his goals with each of these children.” The Appellate Division affirmed the level three determination (128 AD3d at 927-928). By reversing this holding and subtracting *136 those points, the majority presumptively classifies defendant as a “moderate risk” offender and prevents the lower courts from imposing a level three assessment unless an upward departure is imposed.
IV.
Contrary to the majority’s claim, “the interjection of sexual abuse into already-established close relationships” — by “redirecting” a “close and involved relationship! ]” so as to “allow for sexual abuse” — certainly may fall squarely within the plain meaning of risk factor 7 (majority op at 130). In rejecting a commonsense approach, and ignoring defendant’s conduct towards each victim, the majority reduces defendant to a presumptive level two offender, apparently believing this score to be “an accurate determination of the risk” that defendant — a convicted child sex offender — poses to the public (Mingo, 12 NY3d at 574).
Given the plain language of risk factor 7, child molesters may certainly be more likely to receive factor 7 points {see I., supra). That, of course, is the point.
Chief Judge DiFiore and Judges Rivera, Abdus-Salaam and Wilson concur; Judge Garcia dissents and votes to affirm in an opinion in which Judge Fahey concurs.
Order reversed and case remitted to the Appellate Division, Second Department, for consideration of issues raised but not determined on appeal to that court.

. The majority points to the “inherent unfairness” of the People’s reliance on defendant’s relapse prevention plan, as it “was a requirement of his prison-run sex offender counseling and treatment program” (majority op at 128 n 3). But defendant was not required to complete any section of the plan that did not apply to him. Nor is there any suggestion that the details provided by defendant were inaccurate or “embellishfed]” (majority op at 128 n 3). In any event, we need not rely solely on the statements in defendant’s relapse prevention plan, as defendant’s written confession following his arrest — described above — provides ample record support to affirm.

. The majority also remarks that “points were not intended to be assessed” under subdivision (i) of factor 7 “based on grooming, in and of itself” (majority op at 128). I agree. Rather, points are intended to be assessed where an offender “established or promoted” a relationship “for the primary purpose of victimization” (Guidelines, factor 7). Sometimes grooming conduct may qualify as “promoting]”; other times it may not. However, in fairness to lower courts, this Court too has used the term “grooming” as shorthand under this subdivision: “[Tjhere was no clear and convincing evidence that [the offender] purposefully ‘groomed’ the victims for the primary purpose of victimizing them, or, aside from grooming, had any relationship with the girls that would count for factor 7” (People v Izzo, 26 NY3d 999, 1003 [2015]).

. The majority purports to give deference to the Board, at least with respect to its determination that points were not warranted under risk factor 7 (majority op at 129), but declines to give similar deference to the Board’s ultimate assessment of defendant as “a Level III (High) risk for re-offending.” In any event, we have repeatedly stated that the SORA court — -not the Board — is charged with the sole responsibility of adjudicating a defendant’s risk level “by either accepting the Board’s recommendation or rejecting that recommendation in favor of a different risk level classification supported by the evidence presented at the hearing” (People v Gillotti, 23 NY3d 841, 852 [2014], citing Correction Law § 168-n [2], [3]).