People v Carnegie

2026 NY Slip Op 03379

May 28, 2026

Court of Appeals

Garcia, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This decision is uncorrected and subject to revision before publication in the Official Reports.

The People & c., Respondent,

v

Elijah Carnegie, Appellant.

The People & c., Respondent,

v

Anthony Dockery, Appellant.

Decided on May 28, 2026

No. 50 No. 51

Case No. 50:

Zachory Nowosadzki, for appellant.

Jason Eldridge, for respondent.

Case No. 51:

Zachory Nowosadzki, for appellant.

Jason Eldridge, for respondent.

Garcia, J.

[*1]

Both defendants committed sex crimes when they were below the age of 20 and now challenge their risk level designations made pursuant to the Sex Offender Registration Act (SORA) (Correction Law art 6-C), arguing that the lower courts should have considered their young age at the time they committed these offenses as a basis for a downward departure from their presumptive risk level. Not so. Courts may only grant a downward departure request where there is a mitigating factor not adequately taken into account by the Risk Assessment Instrument (RAI). The RAI created by the Board of Examiners of Sex Offenders (the Board) in the "Sex Offender Registration Act: Risk Assessment Guidelines and Commentary" (the Guidelines) treats young age at the time of the offense as an aggravating factor and so provides for the assessment of 10 points in calculating the presumptive risk level where an offender's first sex offense was committed at the age of 20 or younger. Accordingly, because age at the time of [*2]an offender's first sex crime is accounted for in the RAI—10 points are assessed when an offender is under 20—the courts below did not err in refusing to consider defendants' young age at the time the crime was committed as a mitigating factor and the Appellate Division orders should be affirmed.

I.

In Carnegie, defendant pleaded guilty to the gunpoint rape of an 18-year-old woman committed when he was 19; he was sentenced to six to twelve years in prison in North Carolina. He was approved for a transfer of his parole to New York, where the Board prepared a case summary and RAI assessing him 85 points, including 10 points under risk factor 8, based on his age (below 20) at the time he committed the offense. Defendant sought a downward departure, asserting that scientific research shows that young age at the time of offense reduces the likelihood of recidivism and that his strong family support and stable employment would also reduce that risk, and that all these circumstances were mitigating factors not adequately taken into account by the RAI. Defendant's submission included research studies as well as a letter from his father.

Supreme Court rejected the request for a downward departure and adjudicated defendant a level two sexually violent offender, noting that "the Board of Examiners has not amended the Risk Assessment Instrument and . . . [defendant's age] was adequately taken into consideration by the instrument." The Appellate Division affirmed, holding that "Supreme Court properly designated the defendant a level two sex offender" (233 AD3d 903, 904 [2d Dept 2024]). That Court held that "the alleged mitigating factors consisting of the defendant's supportive family and his young age at the time of the commission of the subject sex offense were adequately taken into account by the Guidelines" and that "[m]oreover, the defendant failed to demonstrate how his family support established a lower likelihood of reoffense or danger to the community" (id. at 904). "As to the defendant's age of 19 years at the time of the sex offense," the Court concluded, "an offender's age of 20 or younger at the time of the offense is deemed to be an aggravating factor rather than a mitigating factor" (id.).

In Dockery, when defendant was 18, he attacked two women within a two-month period and was convicted by a jury of robbery, sexual abuse, assault, and attempted rape (see 215 AD2d 497 [2d Dept 1995]). He was sentenced to 24½ to 50 years of incarceration. In advance of his release in 2023, the Board prepared a case summary and RAI assessing him 125 points. Like the defendant in Carnegie, he sought a downward departure, making the same argument that young age at the time of offense reduces the likelihood of recidivism and that his strong family support would also reduce that risk, and therefore that these circumstances were mitigating factors not adequately taken into account by the RAI. Defendant's submission included research studies as well as letters from his father, aunt, two siblings, and niece.

Supreme Court rejected defendant's request for a downward departure and adjudicated defendant a level three sexually violent offender. The court noted that the RAI provides for the addition of points for the commission of a sex crime at a young age and does not permit that fact to be used as a mitigating factor, that defendant had not shown "how the strong family support will prevent the defendant from reoffending," and that family support was [*3]already taken into account by the RAI. The court went on to hold that even if there were mitigating factors not accounted for by the RAI, defendant had not met his burden of proof to establish that those factors are present in his case.

The Appellate Division affirmed, holding that defendant's age at the time of the offense was adequately taken into account by the Guidelines, that "the support provided by a family member with whom the defendant intends to reside is adequately taken into account by the Guidelines' consideration of living arrangements," and that "[w]ith respect to the support offered by other family members, the defendant failed to adequately explain how their support will contribute to a lower likelihood of reoffense or danger to the community" (233 AD3d 808, 809 [2d Dept 2024]).

This Court granted leave to appeal in both cases (43 NY3d 907 [2025]).

II.

SORA directs the Board to "develop guidelines and procedures to assess the risk of a repeat offense by [a] sex offender and the threat posed to the public safety" (Correction Law § 168-l [5]). The RAI, the Board's response to this mandate, provides a method for calculating an offender's presumptive risk level, which the Board uses to make a recommendation to the court "providing for one of . . . three levels of notification" (Correction Law § 168-l [6]). The court must then "make a determination with respect to the level of notification" (id. § 168-n [2]) "by either accepting the Board's recommendation or rejecting that recommendation in favor of a different risk level classification supported by the evidence presented at the hearing" (People v Gillotti, 23 NY3d 841, 852 [2014]).

The Guidelines provide that "the Board or a court may not depart from the presumptive risk level unless it concludes that there exists an aggravating or mitigating factor of a kind, or to a degree, that is not adequately taken into account by the guidelines" (Guidelines at 4). Departures in either direction are "the exception—not the rule," and are merited only "if special circumstances warrant" (id.). The Board has included in the Guidelines several illustrative examples of mitigating factors, based on circumstances described in Correction Law § 168-l (5), that may warrant a downward departure, explaining that "[f]or example, if an offender's presumptive risk level is 3 but he suffers from a physical condition that minimizes his risk of reoffense, such as advanced age or debilitating illness, a downward departure may be warranted" (id. at 5; see also Correction Law § 168-l [5] [d]). Whether a departure is warranted is assessed by a court pursuant to the "three analytical steps" set out in Gillotti (23 NY3d at 861; Guidelines at 4, 7; see also People v Weber, 40 NY3d 206, 210 [2023]). " 'Where the hearing court's findings, expressly made under the proper evidentiary standard, are affirmed by the Appellate Division, this Court's review is limited to whether the decisions below are affected by an error of law or are otherwise not supported by the record' " (People v Perez, 35 NY3d 85, 92 [2020], quoting People v Lashway, 25 NY3d 478, 483 [2015]). The issue here falls within step one of Gillotti—whether young age at the time of first offense is, as a matter of law, a mitigating factor not adequately taken into account by the RAI.

SORA instructs that the RAI must "be based, in part, on a non-exhaustive list of conditions related to the potential risk of reoffense" (People v Francis, 30 NY3d 737, 749 [2018]). These factors, set out in Correction Law § 168-l (5), include several "criminal history factors indicative of high risk of repeat offense," such as "the age of the sex offender at the time of the commission of the first sex offense." In accordance with this statutory mandate to consider age as indicative of recidivism, the Guidelines provide for the imposition of 10 points "if an offender's first sex crime, whether a felony or misdemeanor, was at age 20 or less," because it "is a factor associated with recidivism: those who offend at a young age are more prone to reoffend" (Guidelines at 13).

Defendants' argument that scientific research suggests that young age at the time of offense lowers the risk of reoffense and so is a mitigating factor meriting a downward departure amounts to a policy dispute with the legislature's instruction to the Board to consider that factor, and with the Board's corresponding decision to include age below 20 at the time of first offense as a basis for the assessment of ten points in the RAI—not an argument that the RAI does not "fully capture the nuances of [their] case" (Guidelines at 4). It is the Board that has a "legislative mandate to promulgate" the Guidelines (People v Moss, 43 NY3d 584, 588 [2025]), and disagreement with the basis on which a factor is premised or with the manner in which the Board implements that mandate is "for the legislature and the Board to consider, and not within the scope of this Court's authority" (Francis, 30 NY3d at 750-751). Indeed, " '[t]he constitutional principle of separation of powers . . . requires that the Legislature make the critical policy decisions' " (id. at 751, quoting Bourquin v Cuomo, 85 NY2d 781, 784 [1995]). Here, the legislature did that by instructing the Board to consider as "indicative of a high risk of repeat offense" "the age of the sex offender at the time of the commission of the first sex offense" (Correction Law § 168-l [5] [a] [v], [d]). The Board, based on its [*4]expertise and experience and within the exercise of its discretion, in turn implemented this legislative directive by requiring the assessment of points under risk factor 8 where an offender committed a first sex offense before the age of 20 (see Francis, 30 NY3d at 744, 747). There is no legal basis for reaching the opposite conclusion in the guise of a judicially-fashioned "mitigating" factor. The legislature, and in turn the Board, may of course reconsider this approach to age as an indicator of likelihood of reoffense.

Accordingly, the lower courts properly held that defendants' young age at the time of offense was adequately taken into account by the RAI and there was no need to proceed to the next step of the Gillotti analysis.

III.

Family support and stable employment are, as a matter of law, mitigating factors not adequately taken into account by the RAI and so must be assessed under step two of the Gillotti analysis (see People v Green, — NY3d — [decided today]). Here, while rejecting defendants' downward departure requests on the basis that family support (and, in Carnegie, stable employment) are not mitigating factors, the lower courts went further and analyzed these additional factors under the proper legal standard set forth in step two of Gillotti, considering "whether the party requesting the departure has adduced sufficient evidence to meet its burden of proof in establishing that the alleged . . . mitigating circumstances actually exist in the case at hand" (Gillotti, 23 NY3d at 861). Therefore, remittal is not required.

Accordingly, in each case, the order of the Appellate Division should be affirmed, without costs.

HALLIGAN, J. (Concurring):

I agree with the majority that we are constrained in this appeal by the Board's determination that youth at the time of an offense is an aggravating factor warranting the assessment of points under the Guidelines. Permitting courts to consider youth as a mitigating factor in support of a downward departure would essentially nullify factor 8, and the defendants' contention amounts to a disagreement over what recent scientific research reveals about the relationship between youth and recidivism. The defendant criticizes the Board for failing to consider evidence suggesting that young people who commit sex crimes are unlikely to recidivate. I write separately to note the significance of this research and its implication for youth sex offender registration.

Created by New York's Sex Offender Registration Act (SORA) (L 1995, ch 192), the Board is charged with "develop[ing] guidelines and procedures to assess the risk of a repeat offense by [a] sex offender and the threat posed to the public safety" (Correction Law § 168-l [5]). The Guidelines, adopted by the Board in 1996 pursuant to this mandate, set forth detailed factors used to determine an offender's risk level on a scale of one to three. Level one offenders must register annually for 20 years with the state Division of Criminal Justice Services (DCJS); level two and three offenders must register once a year for life (see id. § 168-h). Level 3 offenders must also personally verify their residences every 90 days with local law enforcement (see id.). In crafting the Guidelines, the Board sought to "incorporate[] risk assessment criteria that find support in the academic literature and are commonly used by sex offender experts" (Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 23 [2006] [*5][hereinafter Guidelines]). The Board stated that those parameters were tested to ensure "accurate results," reviewed by a panel of experts, and amended as the Board deemed appropriate prior to their adoption (see id. at 23-24).

One of the fifteen criteria included in the Guidelines is factor 8: age at first sex crime FN1. According to the Guidelines, this factor is "associated with recidivism" because "those who offend at a young age are more prone to reoffend" (id. at 13). It requires the assessment of ten points if the offender committed a sex offense at age 20 or less, which, in some cases, can represent the difference between spending 20 years or the rest of one's life on the SORA registry.

The Guidelines reference four academic papers in support of this conclusion (see id.). Those papers, all published in the 1980s and early 1990s, suggest that there had been limited research regarding this group of offenders at the time the Guidelines were adopted. One article noted that "[s]cant attention ha[d] been paid to the adolescent or pre-adolescent youngster who commits sexual assaults," and researchers were trying to better understand this population (A. Nicholas Groth & Carlos M. Loredo, Juvenile Sexual Offenders: Guidelines for Assessment, 25 Int J Offender Therapy & Comp Criminology 31, 31 [1981]). Another included just six adolescents (see Nathaniel McConaghy et al., Resistance to Treatment of Adolescent Sex Offenders, 18 Archives of Sexual Behavior 97, 103-104 [1989]). Yet another paper reported that "a substantial portion of all sexual offenses can be attributed to adolescents" but presented no data about adolescent recidivism rates specifically (see Howard E. Barbaree et al., Sexual Assault in Society: The Role of the Juvenile Offender at 11, in The Juvenile Sex Offender [1993]).

It has now been 30 years since the Guidelines were promulgated. Although the Board revised the Guidelines in 2006 to "include updated statutory language and clarification," those revisions did "not change the scoring of the instrument" (Guidelines at 1). Factor 8 remains as it was in 1996.

But since that time, research on adolescent brain development has significantly reshaped how courts, legislatures, and scholars view youth crime. The United States Supreme Court has recognized that "children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking" (Miller v Alabama, 567 US 460, 471 [2012] [internal quotation marks omitted]). "[T]he signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside" (Johnson v Texas, 509 US 350, 368 [1993]). Given these aspects of adolescent development, the Supreme Court has determined that it is "less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character" because "a greater probability exists that a minor's character deficiencies will be reformed" (Roper v Simmons, 543 US 551, 570 [2005]). And accordingly, the Court has banned imposition of certain punishments on juvenile offenders, including the death penalty (see id. at 575); life without parole for non-homicide offenses (see Graham v Florida, 560 US 48, 82 [2010]); and mandatory life without parole for offenses committed before the age of 18 (see Miller, 567 US at 465; see also Montgomery v Louisiana, 577 US 190, 212 [2016] [applying Miller retroactively]; cf. Jones v Mississippi, 593 US 98, 100 [2021] [no requirement to make a separate factual finding of permanent incorrigibility before imposing a discretionary sentence of life without parole]).

This Court has likewise acknowledged "the legislature's recognition of the difference between a youth and an adult" and the corresponding policy choice "to protect young people from the long-term, societal consequences of their early, misdirected actions" (People v Francis, 30 NY3d 737, 750 [2018]). For example, in People v Rudolph (21 NY3d 497 [2013]), we explained that the legislature had made a "policy choice that there be a youthful offender determination in every case where the defendant is eligible, even where the defendant fails to request it," overruling a prior decision, People v McGowen (42 NY2d 905 [1977]), that had required a defendant to request youthful offender adjudication at sentencing (Rudolph, 21 NY3d at 501-502). In a concurring opinion, Judge Graffeo explained why that step was necessary, emphasizing that "society's understanding of juvenile brain function and the relationship between youth and unlawful behavior has significantly evolved" (id. at 506 [Graffeo, J. concurring]; see also Francis, 30 NY3d at 750). Other state high courts have reached similar conclusions (see e.g. In re J.B., 630 Pa [*6]408, 435, 107 A3d 1, 17 [2014]) ["studies suggest that many of those who commit sexual offenses as juveniles do so as a result of impulsivity, and sexual curiosity, which diminish with rehabilitation and general maturation"]; People in Interest of T.B., 2021 CO 59, ¶ 55, 489 P3d 752, 768 [2021] ["juvenile offenders generally are more amenable to rehabilitation and less likely to reoffend than their adult counterparts"]; In re C.P., 131 Ohio St 3d 513, 524, 967 NE2d 729, 740 [2012] [citing Graham and Roper and concluding that "juveniles (are) less culpable than adults" and "their bad acts are less likely to reveal an unredeemable corruptness"]. All of these federal and state court decisions — with the exception of Johnson v Texas, decided in 1993 — postdate the Board's promulgation of factor 8.

In addition, recent literature cited by the defendants raises more specific, and substantial, questions about sexual recidivism risk for juvenile sex offenders. For example, one study based on a sample of more than 27,000 people found that "nine out of ten juvenile sex offenders do not sexually re-offend during the first eight years of legal adulthood, and the temporal pattern of sex recidivism suggests that 85% of juvenile sex offenders will never again recidivate for a sexually-based offense" (Franklin E. Zimring, et al., The Predictive Power of Juvenile Sex Offending: Evidence from the Second Philadelphia Birth Cohort Study at 15 [2007]). Another study examined 300 youth sex offenders and determined that only 4.3% sexually recidivated in adulthood (see Donna M. Vandiver, A Prospective Analysis of Juvenile Male Sex Offenders: Characteristics and Recidivism Rates as Adults, 21 J Interpersonal Violence 673, 681 [2006]). And a recent meta-analysis of 158 studies capturing 80 years of research on the recidivism of youth sex offenders found that "[o]nly a small minority (7—9%) . . . sexually reoffended and the proportion of sexual recidivists identified was consistently low across periods" (Patrick Lussier et al., A Meta analysis of Trends in General, Sexual, and Violent Recidivism Among Youth with Histories of Sex Offending, 25 Trauma, Violence & Abuse 54, 66 [2023]; see also Michael F. Caldwell, Quantifying the Decline in Juvenile Sexual Recidivism Rates, 22(4) Psychology, Public Policy, & Law 414, 414 [2016] [finding 5-year average sexual recidivism rate of 4.92% based on meta-analysis of data from 106 studies involving more than 33,000 cases of adjudicated juvenile sexual offenders]).

The defendants also cite several articles concluding that "[a]n overwhelming amount of research indicates . . . that juvenile sex offenders are far less likely to reoffend than adult sex offenders" (Nikolas Spilson, The Child That No State Wants: Challenging Juvenile Sex Offender Regulations as a Violation of the Right to Travel, 2023 Mich St L Rev 271, 271 [2023]; see also Brittney M. Bowater, Adam Walsh Child Protection and Safety Act of 2006: Is There a Better Way to Tailor the Sentences of Juvenile Offenders?, 57 Cath U L Rev 817, 840 [2008] ["(M)any studies indicate that juvenile sex offenders have a lower recidivism rate than adult sex offenders"]). Indeed, the United States Department of Justice has concluded that "recidivism rates for juveniles who commit sexual offenses are generally lower than those observed for adult sexual offenders" (US Dept of Just, Sex Offender Management Assessment and Planning Initiative at 262 [2017]). And several other state high courts have embraced this finding (see In re A.J.M., 847 NW2d 601, 605-06 [Iowa 2014] ["Research has confirmed that juvenile sex offenders generally are less likely to re-offend than adults, especially when they receive appropriate treatment" (internal quotation marks omitted)]; State in Interest of C.K., 233 NJ 44, 74, 182 A3d 917, 934 [2018] ["generally, juvenile sex offenders are less likely to reoffend than adult sex offenders"]; In re J.B., 630 Pa at 435, 107 A3d at 17 ["While adult sexual offenders have a high likelihood of reoffense, juvenile sexual offenders exhibit low levels of recidivism"]).

As the legislative history indicates, SORA was enacted to "protect[] vulnerable populations and . . . the public from potential harm" caused by sex offenders (L 1995, ch 192, § 1; see also Francis, 30 NY3d at 742). In furtherance of this goal, the key function of the Guidelines is to yield "an accurate determination of the risk a sex offender poses to the public" (People v Mingo, 12 NY3d 563, 574 [2009]). Inherent in this accurate determination is not only what factors make an individual more likely to reoffend, but just as importantly those factors which make an individual less likely to reoffend. But the record before us, as well as a review of publicly available information about the Board's activities, gives no indication that the Board has revisited how a defendant's young age at the time of offense affects their risk of recidivism, despite the insights that have emerged about both adolescent brain development and recidivism among juvenile sex offenders over the last 30 years. In order to fulfill its statutory mandate, the Board may wish to revisit factor 8 in view of the substantial body of scientific literature that did not exist when the scoring for factor 8 was adopted.

For No. 50:

Order affirmed, without costs. Opinion by Judge Garcia. Judges Rivera, Singas, Cannataro, Troutman and Halligan concur, Judge Halligan in a concurring opinion in which Chief Judge Wilson and Judge Rivera concur.

For No. 51:

Order affirmed, without costs. Opinion by Judge Garcia. Judges Rivera, Singas, Cannataro, Troutman and Halligan concur, Judge Halligan in a concurring opinion in which Chief Judge Wilson and Judge Rivera concur.

Decided May 28, 2026

Footnotes

Footnote 1

The legislature tasked the Board with considering factors "indicative of high risk of repeat offense," including "the age of the sex offender at the time of the commission of the first sex offense" (Correction Law § 168-l [5]) without specifying what age group(s), if any, are more likely to reoffend.