People v Green
2026 NY Slip Op 03378
May 28, 2026
Court of Appeals
Cannataro, J.
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

The People & c., Respondent,
v
Hikeem Green, Appellant.

Decided on May 28, 2026
No. 49

Sarah B. Cohen, for appellant.
Jonathan E. Maseng, for respondent.

Cannataro, J.

[*1]
The issue presented by this appeal is whether strong and extensive family support and gainful employment can serve as mitigating circumstances not adequately taken into account by the Sex Offender Registration Act's Risk Assessment Guidelines (Sex Offender Registration Act: Risk Assessment Guidelines and Commentary [Guidelines] [2006]) for purposes of a request for a downward departure from a presumptive risk level. We hold that they can, but that in this case the Appellate Division did not abuse its discretion in determining that defendant failed to meet his burden of establishing the existence of these mitigating circumstances by a preponderance of the evidence.
Between October and December 2012, defendant held two young women against their will and forced them to engage in prostitution. During this period, defendant also raped both women and committed numerous additional acts of violence against them. In May 2013, defendant was convicted, upon his guilty plea, of two counts of sex trafficking (Penal Law § 230.34 [5]) and was sentenced to six to twelve years' imprisonment.
In 2019, in anticipation of his release from prison, the Board of Examiners of Sex Offenders (Board) prepared a risk assessment instrument (RAI) that assessed defendant with a total of 130 points, qualifying him as a [*2]presumptive level three sex offender, and finding no basis for a downward departure FN1. Notably, defendant was assessed zero points for his release environment, including under risk factor 15 for his "living/employment situation." Following his risk assessment hearing, Supreme Court scored defendant with 115 points, resulting in a presumptive level three sex offender designation, and denied his request for a downward departure. The Appellate Division reversed FN2 and remitted for a new hearing to allow Supreme Court to consider two issues, including defendant's request for a downward departure (216 AD3d 1115 [2d Dept 2023]).
Prior to the hearing on remittal, the People submitted an RAI assessing defendant with 115 points, which still classified him as a presumptive level three offender. In support of his downward departure request, defendant emphasized that he had been living offense-free in the community for the 3½ years since his release from incarceration and argued that there were mitigating factors not adequately accounted for by the Guidelines, including, as relevant here, his gainful full-time employment and strong family support. He explained that he had worked as a food delivery driver, obtained his commercial driver's license, become a full-time truck driver, and eventually purchased his own tractor-trailer and founded a freight trucking business. Additionally, defendant supplemented his income by working nights and weekends parking cars as a production assistant on film sets. He viewed his recent history of full-time employment as a significant contributor to a reduced risk of reoffense, characterizing his past crimes as being "financially motivated." In further support of this proposed mitigating factor, defendant cited to statistics documenting the difficulties faced by many formerly incarcerated people, especially sex offenders, in obtaining employment, as well as a publication concerning the importance of structured, full-time employment in preventing recidivism. To establish his alleged strong family support network, defendant referenced his committed relationship with the mother of his young child, and submitted brief letters from four family members and a former landlord asserting that he was a family-oriented man who had been rehabilitated. He also cited to Appellate Division caselaw treating strong family support as a mitigating factor. Defendant maintained that a departure to risk level one would provide adequate supervision and community notification, without overestimating his likelihood of reoffense. The People opposed defendant's departure request, arguing that the factors he relied on as mitigators were adequately accounted for by the Guidelines.
Supreme Court adjudicated defendant a level three sex offender, denying his request for a downward departure without further explanation.
The Appellate Division affirmed, noting that Supreme Court failed to set forth its findings of fact and conclusions of law, but deeming the record sufficient to allow it to reach its own conclusions (229 AD3d 814 [2d Dept 2024]). The Court held, as relevant here, that "his gainful employment and support of his family and friends were adequately taken into account by the Guidelines" and, additionally, that defendant failed to establish how his support system would reduce his likelihood of reoffending or his danger to the community (229 AD3d at 816). This Court granted defendant's motion for leave to appeal (43 NY3d 907 [2025]) and we now affirm.
Under our established three-step framework for adjudicating downward departure requests, the court must first "decide whether the . . . mitigating circumstances alleged by a party seeking a departure are, as a matter of law, of a kind or to a degree not adequately taken into account by the [G]uidelines" (People v Gillotti, 23 NY3d 841, 861 [*3][2014]; see Guidelines at 4). At step two, the court must decide whether the defendant has established by a preponderance of the evidence "that the alleged . . . mitigating circumstances actually exist in the case at hand" (23 NY3d at 861, 864). If the first two steps are satisfied, the court must then weigh the aggravating and mitigating factors present in the case to determine whether, under the totality of the circumstances, a downward departure is warranted to avoid an overassessment of the defendant's dangerousness and risk of reoffending (see 23 NY3d at 861).
In People v Anthony (40 NY3d 976, 979 [2023]), we left open the question of "when evidence relevant to the assessment of points for a particular risk factor—including an assessment of zero points—may also be appropriately considered as mitigation" in the context of a request for a downward departure. We now answer that question in the affirmative.
Although the Guidelines set forth that a court may depart from an offender's presumptive risk level "if special circumstances warrant[,] . . . [t]he expectation is that the [RAI] will result in the proper classification in most cases so that departures will be the exception — not the rule" (Guidelines at 4). This concept flows from the premise that the RAI is intended to be an objective assessment instrument, while also acknowledging that "an objective instrument, no matter how well designed, will not fully capture the nuances of every case" (id.). As a result, if the objective instrument is functioning as intended, in the vast majority of cases an assessment of zero points under a particular risk factor will adequately account for that factor's impact on the offender's risk level.
However, both Gillotti and the Guidelines contemplate a difference in degree as a proper basis for a departure and therefore expressly permit consideration of a circumstance that is already covered by the Guidelines as either an aggravating or a mitigating factor. Indeed, inherent in the concept that a departure can be based on a difference in degree is the prospect that the assessment, or non-assessment, of points under a particular risk factor may not adequately reflect an offender's risk of sexual reoffense and dangerousness. Consequently, the non-assessment of points should not preclude a defendant from asserting that same subject matter as grounds for departure as a matter of law, where the RAI does not adequately account for the reduction in risk under the circumstances presented. This conclusion is in keeping with both the community-protective purpose at the heart of the Sex Offender Registration Act and the court's obligation to make an "individualized" assessment of an offender's risk (see People v Perez, 35 NY3d 85, 87-88 [2020]; Guidelines at 2).
With respect to the mitigating circumstances at issue on this appeal, risk factor 15 contemplates the assessment of points for an "inappropriate" living or employment situation. The Commentary observes that release to an environment that provides ready access to potential victims or makes it more difficult for an offender to be detected may increase the likelihood of reoffending (see Guidelines at 17). The potentially risk-reducing effects of an opposite living or employment situation—with steady employment in an appropriate setting or housing with, or in close proximity to, supportive family or friends—can be asserted as mitigating circumstances despite the assessment of zero points for an inappropriate living or employment situation, so long as the offender can establish that those circumstances are present to a degree not adequately accounted for by the Guidelines (cf. People v Townsend, — NY3d — [decided today] [atypical criminal history to a degree not adequately accounted for by the Guidelines may be an aggravating factor]).FN3
That being said, the portion of the RAI addressing an offender's release environment is weighted less heavily than the rest of the instrument (see Guidelines at 6), at least in part because it attempts to account for variable factors whose mitigating effect can dissipate or cease entirely over time. Moreover, while an offender can petition the court to modify their risk level annually, absent certain statutorily authorized circumstances, the People have no similar opportunity when conditions change (see Correction Law § 168-o). Such considerations, however, do not justify [*4]precluding an offender from establishing strong family support or appropriate employment as mitigating circumstances at the time of their initial assessment, if they can be proven. Throughout, however, the court retains the discretion to take the mutable nature of these factors into consideration when determining the weight they should be accorded, particularly when deciding whether a departure is warranted under the totality of the circumstances, at Gillotti's third step.
The Appellate Division did not err or abuse its discretion in denying defendant's request for a downward departure. Significantly, the Court did not expressly reject defendant's proposed mitigating factors as a matter of law, but went on to conclude that he failed to meet his burden of establishing that the proposed mitigating factors existed in this case. That is, we understand the Court to have concluded that defendant failed to meet his burden at step two of Gillotti in holding that "his gainful employment and support of his family and friends" were adequately accounted for by the Guidelines and that defendant failed to demonstrate how "his support system" would reduce his risk of reoffense (see 229 AD3d at 816 [emphasis added])FN4. This discretionary determination should not be disturbed as it has ample support in the record (see Perez, 35 NY3d at 92).
Accordingly, the order of the Appellate Division should be affirmed, without costs.
GARCIA, J. (Concurring):

The issue here is not "whether strong and extensive family support and gainful employment" (majority op at 1) can serve as factors that reduce a sex offender's risk level. Rather, the issue is how and when a court can properly take those factors into account. The answer, until today, was in two ways: first, a court could consider, as here, whether an offender released prior to a Sex Offender Registration Act (SORA) hearing has lived an exemplary life during his or her time at liberty, including as shown by employment, living arrangements, and letters of support from family and friends; and second, a court could consider the same evidence of exemplary conduct as part of a proceeding that may be brought annually by an offender seeking a modification of their risk level. Under the prior framework, employment, living situation, and the impact of a supportive network could be assessed—as facts—at the time the risk level was assigned or modified by a judge, based on a demonstrated track record indicative of a lower risk to public safety. This approach is consistent with the "primary goal of SORA" to "protect the public from the danger of recidivism posed by sex offenders [and] to assist the criminal justice system to identify, investigate, [*5]apprehend and prosecute sex offenders" (People v Shader, 43 NY3d 129, 135 [2024] [internal quotation marks and citations omitted]).
The majority today, in an unnecessarily broad holding given the facts of this case, creates a third path for considering these "mitigating factors": an incarcerated sex offender may now seek a downward departure by claiming aspirational employment plans and anticipated family support upon release. On that basis, per the majority opinion, a judge now has discretion to reduce the presumptive risk level, even though the offender may never work at the planned job and the family support may never materialize. Unlike the sex offender, the People—and the community—have no recourse; there can be no "upward modification" once the risk level is set. Because this new rule is unnecessary and runs counter to SORA's public safety goals, I concur only in result.FN1
Defendant held hostage, raped, abused, and trafficked two women over the course of six months. After serving six years of his sentence, he was adjudicated a level three sex offender. Due to an unrelated error by the trial court, the Appellate Division remitted the case for a new risk assessment hearing (216 AD3d 1115 [2d Dept 2023]). As a result, defendant was at liberty for three and a half years before that hearing. In advance of his SORA hearing on remittal, defendant requested a downward departure to level one "based on numerous mitigating factors not accounted for by the Board of Examiners' 2019 recommendation, including [defendant's] gainful full-time employment, years at liberty without sexual re-offense, . . . and strong family ties." His submission included letters from four family members, his girlfriend, and a former landlord, all attesting to defendant's rehabilitation, as well as documents showing his employment history over the preceding years FN2. Defendant was again adjudicated a level three sex offender, and again appealed.
While the Appellate Division acknowledged that "lengthy periods of time during which the defendant has been at liberty after the offense without reoffending are not taken into account by the Guidelines or the risk assessment instrument," the Court held that defendant did not demonstrate that while at liberty "he led an exemplary life such that he was entitled to a downward departure from the presumptive risk level" (229 AD3d 814, 815-816 [2d Dept 2024]). Separately, the Court held that defendant's "gainful employment and support of his family and friends were adequately taken into account by the Guidelines" and so were not standalone mitigating factors (id. at 816). As a result, the Court affirmed Supreme Court's designation of defendant as a level three offender.
In crafting its new rule, the majority omits any consideration of the Appellate Division's holding on defendant's demonstrated track record while released and rejects that Court's holding with respect to gainful employment and family support. Instead, the majority declares that those elements are, as a matter of law, mitigating factors not adequately taken into account by the Guidelines, whether those factors are established at the time of the risk level assessment or are merely aspirational.
This new approach runs counter to the Guidelines. A downward departure "is premised on a recognition that an objective instrument, no matter how well designed, will not fully capture the nuances of every case," and so the Risk Assessment Guidelines permit such a departure "if special circumstances warrant" (Sex Offender Registration Act: Risk Assessment Guidelines and Commentary [Guidelines] at 4). "The expectation is that the instrument will result in the proper classification in most cases so that departures will be the exception—not the rule" (id.). The first step of the three-step Gillotti analysis to determine whether a departure is warranted considers whether the "mitigating circumstances alleged by a party seeking a departure are, as a matter of law, of a kind or to a degree not adequately taken into account by the [G]uidelines" (People v Gillotti, 23 NY3d 841, 861 [2014]). The majority believes that employment and living environment are accounted for in the Guidelines, but not to the right degree (majority op at 6-7), and that "substantial support from family or other community members with whom they do not reside, or with whom they do not live in close proximity" is of a kind "not otherwise encompassed by any risk [*6]factor" (id. at 7 n 3)FN3. As a result, every time an offender asserts that these factors exist or that the offender believes they may later come to pass, the court must proceed beyond the first Gillotti step. By opening the door in this way, the Court has now sent a signal to lower courts that such aspirational goals are legitimate factors in assessing the risk a sex offender poses to public safety.
The Guidelines assess ten points under factor 15, "Living or Employment Situation," where "[t]he offender's living or employment situation is inappropriate" (Guidelines, risk factor 15). Because a risk assessment hearing is held, in the normal course, in advance of an offender's release, this factor captures prospective conditions: the offender's planned living situation and anticipated employment plans. Every other section in the Guidelines addresses a component of the crime or the offender's status that is measurable at the time of release; it is only the release environment that considers a speculative aspect of an offender's recidivism risk. Since the planned living environment and anticipated employment of a recently released offender is "prospective and can readily change, the Board chose not to weigh this section as heavily as others in the assessment instrument" (Guidelines at 6). In other words, an offender's planned release environment is assessed as having a less negative impact than other high risk factors, because of the Board's recognition that the planned living situation or employment could change.
The majority exercises no similar caution in reaching the opposite conclusion, elevating entirely speculative factors to those that, as a matter of law, must be considered. The danger of this is clear. Just as an offender employed in an inappropriate setting may change jobs to a more appropriate one, an offender relying heavily on planned employment may lose that job—in a year, in a week, or even a day after release FN4. Likewise, an offender whose family or friends proclaimed support for him may lose that support—through death, a move (such as the one anticipated by defendant's girlfriend here), or a mere change of heart once the offender is released back into the community. But having deemed these factors to be mitigating as a matter of law, the majority's holding requires lower courts to consider them as a basis for a downward departure. As a result, an offender may be classified with a lowered risk level that underestimates his danger to the community.
And once that lowered risk level is assigned, it cannot be changed; SORA provides no opportunity for the People to increase the classification level of an underassessed offender. That is, where an offender's risk of recidivism is assessed at an initial hearing based on speculative factors that never come to pass—for example, as a level 1 offender not requiring disclosure on the public website—the People have no recourse to modify that classification to correct the resulting underassessment of risk in the interest of public safety. Counsel's assurance at oral argument that Correction Law § 168-o does indeed provide a mechanism for the People to seek a modification—when a new crime is committed—is cold comfort to the potential victim of a recidivist sex offender.
The majority's holding is all the more troubling because it is unnecessary. SORA includes mechanisms by which a court may consider all factors indicative of rehabilitation and reduced recidivism—once they have been established. First, because "lengthy periods of time during which the defendant has been at liberty after the offense without reoffending are not taken into account by the Guidelines or the risk assessment instrument" (Green, 229 AD3d at 815), a court holding a risk assessment hearing for a released offender may consider an impressive job history or letters of support from family and community members attesting to an offender's exemplary conduct while at liberty in determining an offender's initial risk level (see e.g. People v Collier, — NY3d —, 2026 NY Slip Op 00074, *6-7 [2026]; People v Gonzalez, 138 AD3d 814, 815 [2d Dept 2016]). Likewise, pursuant to Correction Law § 168-o, an offender may petition, yearly, for "an order modifying the level of notification," and a court considering a modification request may take into account those same factors in assessing whether circumstances have changed such that a downward modification is warranted (see e.g. People v Booker, 240 AD3d 620, 621-622 [2d Dept 2025]; People v Davis, 179 AD3d 183, 188-192 [2d Dept 2019] [granting modification where "defendant's submissions demonstrated that, through his long-term sobriety, strong family support, faith-based and law abiding lifestyle, (and) continuous employment despite his numerous physical disabilities and age, his risk of reoffending is so diminished that a further reduction (to risk level one) is appropriate"]). Accordingly, to the extent that years of strong family and community support and stable employment reduce the likelihood of recidivism, those factors can be, and often are, considered during a delayed initial hearing or a modification proceeding, once an offender has actually engaged in that employment and benefited from that family support. There is no need to order courts to consider reducing an offender's risk level based on anticipated conditions that may not come to pass, particularly when there are means available for taking them into account once they have been established. Not to mention the difficult task courts will face, at what is now a mandatory assessment under step two of Gillotti, of determining whether an offender has met his burden of showing by a preponderance of the evidence that he intends to have strong family support and a steady job.
Finally, straying even further from the issue presented in this case, the majority also declares that it is resolving the broad question of " 'when evidence relevant to the assessment of points for a particular risk factor—including an assessment of zero points—may also be appropriately considered as mitigation' in the context of a request for a downward departure" (majority op at 5). Such a holding is unnecessary to the specific question at issue on this appeal—the majority could easily cabin its already overbroad holding to the particular risk factor raised here—yet the harm from this expansion is obvious. Surely the likely result is future challenges to SORA risk level assessments insisting that other factors for which an offender has been assessed no points must be considered as mitigating factors that warrant a downward departure, for example where an offender proclaims exceptional acceptance of responsibility (see Guidelines, risk factor 12) or an extraordinary lack of violence (see Guidelines, risk factor 1).
But while insisting that the ultimate determination to "take the mutable nature of these factors into consideration" remains within the discretion of the trial judge (majority op at 7-8), the majority overlooks the influence its decision will have on the risk assessment process. Today's holding signals to lower courts that these factors bear weight—that they should be considering, for example, the fact that an offender's parent believes he has been rehabilitated before his release. Heartfelt as that belief might be, it is hard to understand how it properly fits into an analysis of "the threat posed to the public safety" by a sex offender (Correction Law § 168-l [5]) or how it constitutes a special circumstance. The majority opens this door and points the way through.
Order affirmed, without costs. Opinion by Judge Cannataro. Chief Judge Wilson and Judges Rivera and Halligan concur. Judge Garcia concurs in result in an opinion, in which Judges Singas and Troutman concur.
Decided May 28, 2026

Footnotes

Footnote 1
An offender's presumptive risk level is calculated by totaling the points the offender scores in each category of the RAI (see Guidelines at 3). A score of 70 points or fewer results in a presumptive level one classification; a score between 70 and 110 points renders the offender a presumptive level two; and a score of 110 points or more results in a presumptive level three (see id.). The length of time during which an offender must register with law enforcement, the frequency with which they must register, and the extent of personal information about the offender provided to the public increases with each increase in risk level designation. Generally, level one offenders must register annually for 20 years with the Division of Criminal Justice Services, while level two and three offenders must register annually for life (see Correction Law §§ 168-h, 168-q).

Footnote 2
The People failed to provide defendant with the requisite 10-day notice of the factual predicate for their intention to seek points under risk factor 1 based on a different theory than that set forth in the Board's RAI (see Correction Law § 168-n [3]). That error is no longer at issue in this appeal.

Footnote 3
Strong family or community support separate from an offender's living situation can also be asserted as a mitigating circumstance, because it is "of a kind . . . not adequately taken into account by the [G]uidelines" (see Gillotti, 23 NY3d at 861 [emphasis added]). As discussed above, risk factor 15 only covers an offender's "living environment," "situation," or "arrangements" (Guidelines at 6, 17-18), but an offender may receive substantial support from family or other community members with whom they do not reside, or with whom they do not live in close proximity. Such support is external to the offender's living arrangements, and not otherwise encompassed by any risk factor in the Guidelines.

Footnote 4
We interpret the Appellate Division's reference to "his support system" to encompass defendant's alleged mitigating circumstances of gainful employment and strong family support (see 229 AD3d at 816 [emphasis added]). Therefore, although defendant argues that the Appellate Division only addressed his alleged mitigating circumstance of gainful employment at Gillotti's first step, we disagree, and view this circumstance as rejected by the Appellate Division at step two of Gillotti. In this regard, we note that it would be best practice for lower courts to indicate which step of the Gillotti analysis they are reaching when setting forth their conclusions.

Footnote 1
I agree with the majority that remittal is not necessary in this case because the court concluded that defendant failed to meet his burden of establishing the existence of mitigating factors (see majority op at 2, 8).

Footnote 2
At his initial hearing, defendant requested a downward departure based on anticipated family support and planned employment, submitting three employment offer letters and 23 letters from family and community supporters.

Footnote 3
The majority suggests that "substantial support from family or other community members with whom they do not reside, or with whom they do not live in close proximity" (majority op at 7 n 3) is akin to an offender's extensive history of violent sex crimes as a factor not adequately taken into account by the Guidelines.

Footnote 4
At defendant's hearing, defense counsel claimed that his crimes—presumably including the sexual assaults—were "financially motivated" (see majority op at 3) and that his current employment showed that he "is committed to earning money in a legal way." It is fair to wonder whether as a result, if his current employment were to end, his likelihood of reoffense would increase.